No. 28,211.

THE STATE OF KANSAS, *Appellee*, v. PAUL CUSTER, *Appellant*.

(282 Pac. 1071.)

Opinion filed December 7, 1929.

*M. F. Cosgrove,* of Topeka, and *John C. King,* of Liberal, for the appellant.

*William A. Smith,* attorney-general, *R. O. Mason,* assistant attorney-general, *H. A. Gaskill, Charles M. Tucker* and *Charles Vance,* all of Liberal, for the appellee.

The opinion of the court was delivered by

BURCH, J.: Defendant appeals from conviction of manslaughter in the fourth degree on an information charging that while he was driving an automobile on a public highway at an unlawful rate of speed and in a culpably negligent manner his automobile struck and killed a man. The principal question is whether the court properly instructed the jury.

The accident occurred on a graveled highway leading north from the end of the pavement on Kansas avenue in Liberal. A quarter of a mile north of the end of the pavement is a crossroad. C. O. Cohenour left Liberal between ten and eleven o'clock on a clear night, in a Chevrolet automobile having no top, and drove northward on the highway. With him were Clyde Wood and another man. The left rear tire went down, and the automobile was stopped at a point about 260 yards north of the end of the pavement. The right wheels were a foot and a half or two feet from the shoulder of the road. Cohenour and Wood got out. Wood took the jack and got down on his hands and knees to adjust the jack under the rear axle. Cohenour commenced to remove the taps which held the tire on. The front of the car faced northward. The car had no red light at the rear, and Cohenour testified at the coroner's inquest he could not remember whether his headlights were showing. Custer, driving a Buick master-six sedan, came from the south, struck the Chevrolet, and Wood was killed.

Custer testified that, as he was driving northward, a car coming at a rapid rate of speed approached from the north. That car was followed by a Ford coupé with bright lights. As the first car approached, Custer "dimmed" his headlights—that is, tilted them downward, which affected range only and not intensity of light—and kept them so for the benefit of the Ford driver. The first car raised a cloud of dust, the Ford lights blinded Custer, and he was unable to see Wood until within ten or fifteen feet of him. Custer testified he was driving about thirty-five miles per hour, possibly a little more, but not more than forty miles per hour.

There was testimony that before the accident occurred a Buick car was coming from the north, but the accident occurred before that car reached the crossroad. There was testimony that a Ford coupé on the crossroad approached the intersection from the west, and on reaching the intersection turned south on the gravel road, but the accident occurred before the Ford coupé reached the intersection and turned south. There was testimony that at the time of the accident Custer was driving at a much greater rate of speed than forty miles per hour.

The court gave the jury instructions, which are appended hereto.

The section of the statute under which defendant was convicted is a part of the article of the crimes act dealing with manslaughter.

The function which the section performed was described in the opinion in the case of *State v. Murray*, 83 Kan. 148, 110 Pac. 103:

"In the preparation of the crimes act the legislature segregated certain homicides, committed under specified conditions, and called them justifiable. It did the same with certain other homicides, committed under specified conditions, and called them excusable. By this means certain specific killings are exempt from punishment. Conceiving that there may be other killings which ought not to be punished, the legislature then exempted all other homicides which were justifiable or excusable under the common law. . . .

"The legislative intention was to punish all homicides which are not justifiable or excusable, either under the statute or under the common law. In providing a scheme of punishments the same method was adopted as in the case of exemptions. A homicide committed under certain specifically enumerated conditions was made punishable as murder in the first degree. Another kind of killing under certain other specific conditions was made punishable as murder in the second degree. Various kinds of homicides, the elements of which are all named, constitute manslaughter in the first degree, and so with manslaughter in the second, third and fourth degrees. Understanding very well that it had not, in two degrees of murder and four degrees of manslaughter, provided for all punishable killings, the legislature then undertook by section 27 of the crimes act to cover all those which had not been specifically provided for. That section reads as follows:

" 'Every other killing of a human being, by the act, procurement or culpable negligence of another, which would be manslaughter at the common law, and which is not excusable or justifiable, or is not declared in this article to be manslaughter in some other degree, shall be deemed manslaughter in the fourth degree.' [R. S. 21-420.]" (p. 157.)

The quoted section appears in the acts of the first territorial legislature (Stats. Kan. Ter. 1855, ch. 48, § 22), was reënacted by the territorial legislature of 1859, and remained in force after the state was admitted to the union until 1868. In that year the section became section 27 of chapter 31 of the General Statutes of Kansas, and has ever since remained in force.

The section was originally taken from the crimes act of the state of Missouri (Rev. Stat. Mo. 1835, title Crimes and Punishments, art. II, § 20). A similar section appeared in the Revised Statutes of New York, 1829, part IV, title II, article first, § 19.

The early crimes acts of Missouri and New York have sections which are equivalent to the section of our territorial crimes act which is now R. S. 21-407, and which reads as follows:

"The killing of a human being without a design to effect death, by the act, procurement or culpable negligence of another, while such other is engaged in the perpetration or attempt to perpetrate any crime or misdemeanor, not amounting to a felony, in cases when such killing would be murder at the common law, shall be deemed manslaughter in the first degree." (R. S. 21-407.)

The early crimes acts of Missouri and New York contained sections relating to manslaughter resulting from operation of steamboats, which came into our law. One provision was that if a person navigating a boat for gain should "willfully or negligently" receive so many passengers that the boat should sink and some one be drowned the navigator would be guilty of manslaughter in the third degree. Another provision was that if the captain in charge of the boat, or the engineer in charge of the boiler, should, from "ignorance or gross neglect," or for the purpose of racing, create or allow to be created such an undue quantity of steam as to burst the boiler, and some one should be killed the captain or engineer would be guilty of manslaughter in the third degree. (Gen. Stat. 1915, §§ 3382, 3383.) Other provisions related to safety of navigation, but those referred to are sufficiently illustrative. The result is that criminal codes used, in sections relating to different degrees of manslaughter, 'the expressions "culpable negligence," "gross negligence," and "negligence."

Early state statutes simply provided a punishment for manslaughter, and left manslaughter to be defined by common law. (Rev. L. Mo. 1825, title Crimes and Misdemeanors, ch. I, § 6.) When statutes dealt with the crime, and divided it into degrees according to amount of culpability, special cases found necessary to meet modern exigencies were added. In some instances modes of killing which would have been murder at common law were reduced to manslaughter. In general, however, the statutes conformed to common-law principles, and so far as they did so merely codified the common law. The catch-all section, our R. S. 21-420, did more than that. It clearly sent us directly to the common law for definition of certain manslaughters.

The reference method of legislation was condemned by the New York commission appointed pursuant to a statute of 1857 to prepare a political code, a civil code, and a penal code. In the report of the commission (David Dudley Field, chairman), in April, 1864, it was said it was essential to usefulness of the penal code that its definitions should not be dependent on recourse to the common law to render them intelligible. Pursuant to the recommendation, the provision relating to homicide by "act, procurement, or culpable negligence," was omitted and the following was substituted:

"Such homicide is manslaughter in the first degree, when committed without a design to effect death:

"3. By any act, procurement or culpable negligence of any person, which, according to the provisions of this article, does not constitute the crime of murder in the first or second degree, nor manslaughter in the first degree." (Consolidated Laws New York, 1923, pp. 1439, 1440, ch. 41, §§ 1050, 1052.)

The present meaning of our statute is the meaning it bore in 1855 (*State v. Spendlove,* 47 Kan. 160, 172, 28 Pac. 994). No change of meaning, to apply it to homicide committed on a highway by operation of an automobile, is permissible. However, the law books contained numerous cases involving manslaughter committed on highways by persons riding horseback and driving carts and other vehicles. While the automobile is a new means of transportation the principles involved were well established when the common law relating to manslaughter was adopted.

The lexicons tell us that Cicero and Horace used the word "culpa" in the sense of crime; fault; and in some metonymic senses. Formerly, the primary meaning of the English word "culpable" was criminal; deserving punishment. Doctor Johnson's dictionary defined the word thus: Criminal (*Shak.*); guilty (*Spenser*); blameworthy (*Hooker*). In popular use the primary meaning has now shaded down to: deserving blame or censure; blameworthy. (Oxford English Dictionary.)

In Blackstone's chapter on Plea and Issue, it is said a prisoner desiring to plead the general issue, or not guilty, pleaded *"non culpabilis,"* or *"nient culpable."* The clerk entered the plea on the minutes *"non cul."* or *"nient cul."* A sort of oral replication by the king indicating the prisoner was guilty and the king was ready to prove him so, *"Prit præsto sum,"* was entered on the minutes *"Cul. prit."* (4 Commentaries, 339.) There can be no doubt that when the phrase "act, procurement, or culpable negligence" was coined "culpable," in legal parlance, referred to guilt whenever crime was the topic; and the strong probability is that the term "culpable negligence," used in a manslaughter statute, meant negligence punishable criminally.

As indicated, the purpose of the statute under consideration was to fill a gap in the crimes act by bringing common-law manslaughter within its provisions. There was no purpose either to minimize or magnify negligence as an element of common-law manslaughter. Whatever the qualifying word "culpable" may have meant the killing was one which would be manslaughter at the common law. Therefore the meaning of the statute is "every other killing by

such act, such procurement, or such negligence, as would constitute manslaughter at the common law"; and the statute has the same effect as if it read "every other killing which would be manslaughter at the common law, not excusable," etc.

The result is a prosecution under the statute is not for "culpable negligence" but for common-law manslaughter; and the question is not what sort of negligence culpable negligence may be, but what constituted common-law manslaughter committed by the negligent doing of a lawful act.

Blackstone's Commentaries, which soon after publication were accepted as authority by his brethren across the sea, contained the following:

"Manslaughter is therefore thus defined; the unlawful killing of another without malice, either express or implied; which may be either voluntarily, upon a sudden heat; or involuntarily, but in the commission of some unlawful act.

. . . . . . . . . . . . .

"The second branch, or involuntary manslaughter, differs also from homicide excusable by misadventure in this: that misadventure always happens in consequence of a lawful act, but this species of manslaughter in consequence of an unlawful act. . . .

"So where a person does an act, lawful in itself, but in an unlawful manner, and without due caution and circumspection; as when a workman flings down a stone or piece of timber into the street, and kills a man; this may be either misadventure, manslaughter, or murder, according to the circumstances under which the original act was done; if it were in a country village, where few passengers are, and he calls out to all people to have a care, it is misadventure only; but if it were in London, or other populous town, where people are continually passing, it is manslaughter, though he gives loud warning; and murder, if he knows of their passing, and gives no warning at all, for then it is malice against all mankind." (Book IV, pp. 191, 192.)

It will be observed that Blackstone did not define "due caution and circumspection." He merely gave an example of what would according to circumstances constitute misadventure, manslaughter, and murder.

East's Pleas of the Crown appeared in the United States in 1806. The following quotation is pertinent:

"Again, a person driving a carriage happens to kill another: if he saw or had timely notice of the mischief likely to ensue, and yet willfully drove on, it will be murder; for the presumption of malice arises from the doing of a dangerous act intentionally; there is the heart regardless of social duty. If he might have seen the danger, but did not look before him, it will be manslaughter, for want of due circumspection. But if the accident happened in

such a manner that no want of due care could be imputed to the driver, it will be accidental death, and he will be excused.

"A. was driving a cart with four horses in the highway at Whitechapel; and he being in the cart, and the horses upon a trot, they threw down a woman who was going the same way with a burthen upon her head, and killed her. Holt, C. J., Tracy, J., Baron Bury, and the Recorder Lovel, held this to be only misadventure. But, by Lord Holt, if it had been in a street where people usually pass, this had been manslaughter; but it was clearly agreed that it could not be murder. [1704.]

"It must be taken for granted, from this note of the case, that the accident happened in a highway *where people did not usually pass;* for otherwise the circumstance of the driver's being in his cart, and going so much faster than is usual for carriages of that construction, savoured much of negligence and impropriety; for it was extremely difficult, if not impossible, to stop the course of the horses suddenly in order to avoid any person who could not get out of the way in time. And indeed such conduct in a driver of such heavy carriages might under most circumstances be thought to betoken a want of due care, if any, though few persons might probably pass by the same road.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"The greatest possible care is not to be expected, nor is it required; but whoever seeks to excuse himself, for having unfortunately occasioned by any act of his own the death of another, ought at least to shew that he took that care to avoid it which persons in similar situations are most accustomed to do. . . ." (1 East's Crown Law, pp. 263, 264.)

In the case of the man driving the cart and four horses at a trot, the fact that the man was in the cart was important because, as the facts of some other cases indicate, he was driving without reins, and his proper place was at the heads or sides of his horses; and if, as Lord Holt suggested, the street was a commonly used street, what East said "savoured of negligence and impropriety" was recklessness. It was true, as East suggested, that if a driver showed he took such care as persons in similar situations were accustomed to take, he would not be guilty of manslaughter. But suppose he fell a little short of that. He would be liable in damages in a civil action. But manslaughter was a felony, and would he be guilty of a felony?

In course of time, following publication of East's book, data accumulated, generalizations were made, and principles latent in but nevertheless pervading the common law relating to crime, were developed and applied. The result was it came to be thoroughly understood that the system of thought known as the common law did not sanction conviction of a man of manslaughter resulting from negligent conduct, unless his conduct was accompanied by a wrong mental attitude having the qualities of recklessness.

A sort of hop, skip and jump through the cases is all that is practicable here.

In the case of *Rex v. Long*, 4 C. & P. 423 (1830), Bayley, B., summing up, said:

"The indictment charges the prisoner with having caused the death of Mrs. Lloyd, by the application of a certain liquid; and the points for your consideration will be first, whether Mrs. Lloyd came to her death by the application of the liquid; and secondly, whether the prisoner, in applying it, has acted feloniously or not. . . . The thing to look at is, whether, in reference to the remedy he has used, and the conduct he has displayed, he *has acted with a due degree of caution*, or, on the contrary, has acted with *gross and improper rashness, and want of caution.* . . . If you shall be of opinion that the prisoner made the application with a gross and culpable degree of rashness, and that it was the cause of Mrs. Lloyd's death, then, heavy as the charge against him is, he will be answerable on this indictment for the offense of manslaughter. . . . You will consider these two points: first, of what did Mrs. Lloyd die?. You must be satisfied that she died of the wound which was the result of the application made on the 10th of October; and then, secondly, if you are satisfied of this—whether the application was a felonious application. This will depend upon whether you think it was gross and culpable rashness in the prisoner to apply a remedy which might produce such effects, in such a manner that it did actually produce them." (p. 440.)

In the case of *Regina v. Whitehead*, 3 C. & K. 202 (1848), Maule, J., in summing up to the jury, said:

"If a medical or any other man caused the death of another intentionally, that would be murder; but where a person *not intending to kill a man,* by his gross negligence, unskillfulness, and ignorance, caused the death of another, then he was guilty of culpable homicide; . . ." (p. 204.)

In *Regina v. Noakes*, 4 F. & F. 920 (1866), the report reads:

"Erle, C. J., strongly put it to the jury that they ought not to call upon the prisoner for his defense; and that the case was not sufficiently strong to warrant them in finding the prisoner guilty on a charge of felony. They could not, he said, convict on such a charge, unless there was such a degree of complete negligence as the law meant by the word felonious. . . . Without saying that there might not be evidence of negligence in a civil action, he did not think that there was sufficient to support a conviction in a criminal case." (p. 921.)

The reporter's note is illuminating:

"The case is certainly of some practical importance, as affording a remarkable illustration of that which it has too often been said cannot be defined, and can only be described by means of illustrations, viz., culpable or *criminal negligence.* It is impossible to define it, and it is not possible to make the distinction between actionable negligence and criminal negligence intelligible, except by means of illustrations drawn from actual judicial opin-

ions. . . . The real ground of the opinion was, that even a culpable mistake, and some degree of *culpable* negligence, is not *felonious,* unless it be so gross as to be reckless." (pp. 921, 922.)

In the case of *Regina v. Spencer,* 10 Cox's C. C. 525 (1867), Willes, J., in summing up, said:

"Before they could find the prisoner guilty, they must trace what he did to an evil mind. Here there was clearly no dishonest feeling, as the prisoner took some of the medicine himself. There being, therefore, nothing intentional, there were three modes in which the strychnia could have been administered to the deceased. First, through gross negligence on the part of the prisoner. . . . Secondly, the poison might have been administered by mistake, but a blunder alone would not render the prisoner criminally responsible. . . . Thirdly, it was possible that the strychnia got into that bottle through the accident of some one else. If so, the accident was most lamentable, but it would be still more lamentable that the prisoner should be held criminally responsible for it. . . ." (p. 526.)

In *Regina v. Finney,* 12 Cox C. C. 625 (1874), Lush, J., said to the jury:

"To render a person liable for neglect of duty there must be such a degree of culpability as to amount to gross negligence on his part. [Evidence summed up.] If you think that indicates gross carelessness, then you should find the prisoner guilty of manslaughter; but if you think it inadvertence not amounting to culpability, or what is properly termed an accident, then the prisoner is not liable." (p. 626.)

The case of *Rex v. Walker,* 1 C. & P. 319 (1824), is interesting. The report reads:

"This prisoner was indicted for manslaughter, in killing Thomas Crates.

"The deceased was walking along the road leading from Bristol to Bitton, *in a state of intoxication.* The prisoner was driving a cart drawn by two horses without reins; the horses were cantering, and the prisoner sitting in front of the cart. On seeing the deceased, he called to him twice to get out of the way, but from the state he was in, and the rapid pace of the horses, he could not do so; and one of the cart wheels passed over him, and he was killed.

"Garrow, B., laid down, that if a man drive a cart at an unusually rapid pace, *whereby a person is killed,* though he calls repeatedly to such person to get out of the way, if from the rapidity of the driving, *or any other cause,* the person cannot get out of the way time enough, but is killed, the driver is in law guilty of manslaughter; and that it is the duty of every man who drives any carriage, to drive it with such care and caution as to prevent, as far as in his power, any accident or injury that may occur. Verdict, guilty."

In England trial judges knew their business. They dealt with actual cases of conduct. The question in any case was whether the person charged was a bad actor or not—one who evinced malice, or wrongful intention, or one who, having a less guilty mind, was

still such a bad actor that he ought to be punished criminally. In this instance, although the judge had many precedents, he did not mention negligence. What he did was to impose a standard of duty next to that which would make a cart driver an insurer, with the result—verdict, guilty.

The first American edition of Hale's Pleas of the Crown appeared in 1847. The American editor's note to a section showing how an act, such as dropping a tile while tiling a house, may be murder, manslaughter, or mere misfortune, according to the circumstances, reads as follows:

"[4.] There are many cases in which a party causing the death of another, without positive intention of inflicting injury, is criminally responsible, though he is never chargeable with murder under such circumstances. The test of responsibility is whether the conduct of the accused was contrary to any law, or not being so forbidden, was so gross, negligent, or violent as necessarily to produce the belief that the act which remotely or immediately caused death was such an act, or was done in such manner as to involve moral impropriety. . . . [Citations.]" (1 Hale P. C. 1st Am. ed., 474.)

In this note the word "negligent" is classified with "gross" and "violent," and what follows directs attention to the mental attitude of the defendant.

The first edition of Wharton on Homicide was published January 1, 1855. Chapter VII relates to homicide by negligence. The second division of the chapter relates to negligence of persons riding or driving, which the author considers under two heads, speed, and caution. The English cases were reviewed, and East's Pleas of the Crown was cited and quoted; but the chapter contains nothing to indicate that the English common law relating to homicide by negligence had been displaced by an American common law governing the subject.

The cases decided between 1824 and 1847 involving manslaughter by negligent riding and driving are collated in 9 Halsbury, Laws of England, 582, note L.

Between 1807 and 1848 the subject of manslaughter through negligence received much consideration, particularly in cases in which the law imposed a duty, or a person had taken upon himself a duty, tending to preservation of life. The distinction between tort and crime was clarified, and it became well established that a higher degree of negligence was necessary to convict of manslaughter than was required to establish civil liability.

In Archbold's Criminal Pleading, 27th ed., 888, the following statements appear, supported by numerous authorities:

"Where death results in consequence of a negligent act, it would seem that to create criminal responsibility the degree of negligence must be so gross as to amount to recklessness. Mere inadvertence, while it might create civil liability, would not suffice to create criminal liability. . . . And it is not sufficient to create criminal liability to show that the act which caused death constituted a tort."

The subject was set at rest by the lord chief justice, in the appeal of Percy Bateman, 19 Cr. App. Rep. 8 (1925). Bateman was a physician who was charged with malpractice in an obstetrical case, and was convicted of manslaughter. On appeal the conviction was quashed. In the opinion it was said:

"Before we deal with the directions of the learned judge to the jury, it may be well to consider generally the law on this subject. In expounding the law to juries on the trial of indictments for manslaughter by negligence, judges have often referred to the distinction between civil and criminal liability for death by negligence. The law of criminal liability for negligence is conveniently explained in that way. If A. has caused the death of B. by alleged negligence, then, in order to establish civil liability, the plaintiff must prove (in addition to pecuniary loss caused by the death) that A. owed a duty to B. to take care, that that duty was not discharged, and that the default caused the death of B. To convict A. of manslaughter, the prosecution must prove the three things above mentioned and must satisfy the jury, in addition, that A.'s negligence amounted to a crime. In the civil action, if it is proved that A. fell short of the standard of reasonable care required by law, it matters not how far he fell short of that standard. The extent of his liability depends not on the degree of negligence, but on the amount of damage done. In a criminal court, on the contrary, the amount and degree of negligence are the determining question. There must be *mens rea*. . . .

"In explaining to juries the test which they should apply to determine whether the negligence, in the particular case, amounted or did not amount to a crime, judges have used many epithets, such as 'culpable,' 'criminal,' 'gross,' 'wicked,' 'clear,' 'complete.' But, whatever epithet be used and whether an epithet be used or not, in order to establish criminal liability the facts must be such that, in the opinion of the jury, the negligence of the accused went beyond a mere matter of compensation between subjects and showed such disregard for the life and safety of others as to amount to a crime against the state and conduct deserving punishment." (pp. 10, 11.)

In discussing the alleged misdirection of the jury by the trial court, the lord chief justice said:

"If the words 'gross,' 'wicked' and 'culpable' are put aside, this summing-up amounts to a direction to the jury that they must draw the line between mistake or error of judgment on the one hand, and carelessness or incompetence

on the other hand. If there was only mistake or error of judgment there is no liability, but if there was any falling short of a fair average degree of care or competence, then there is liability. Such a direction would be complete and accurate on the trial of an action for damages for negligence. It is not adequate on the trial of an indictment for manslaughter. . . . It is, nevertheless, most desirable that in trials for manslaughter by negligence it should be impressed on the jury that the issue they have to try is not negligence or no negligence, but felony or no felony. It is desirable that, as far as possible, the explanation of criminal negligence to a jury should not be a mere question of epithets. It is, in a sense, a question of degree, and it is for the jury to draw the line, but there is a difference in kind between the negligence which gives a right to compensation and the negligence which is a crime." (p. 16.)

The only decision by the supreme court of Missouri which has been found construing the "act, procurement or culpable negligence" manslaughter statute before we adopted it, is the decision in the case of *Rice v. The State*, 8 Mo. 561 (1844). The opinion reads:

"The twentieth section of the second article of the act concerning crimes declares [statute quoted].

"In order to bring offense within this provision, it must appear that it was manslaughter at common law." (p. 563.)

Beginning with the case of *The State v. Emery*, 78 Mo. 77 (1883), the supreme court of Missouri has rendered several decisions interpreting the words "culpable negligence" as meaning omission to use such care as an ordinarily prudent person would use under the circumstances. The qualifying provision of the statute, "which would be manslaughter at the common law," has been given no more attention than it would have received if it were not in the statute book. (See *State v. Horner*, 226 Mo. 110.) The Missouri statute has since been amended to correspond substantially with the amended New York statute. (Rev. Stats. Mo. 1919, § 3236.) The culpable negligence statutes of other states take that form, and so eliminate consideration of common-law manslaughter.

There were no decisions in New York before the penal code was amended which aid in interpretation of the old "act, procurement or culpable negligence" statute. In the case of *People v. Buddensieck*, 4 N. Y. Cr. Rep. 230, the defendant was convicted of manslaughter resulting from culpable negligence. The trial court interpreted culpable negligence to mean want of such care as a man of ordinary prudence would use under the circumstances. The court of appeals affirmed the judgment, with the statement that the case had been well tried. In the recent case of *People v. Angelo*, 219 App. Div. 646, 221 N. Y. Supp. 47 (1927), the defendant was con-

victed of manslaughter in the second degree for culpable negligence in the operation of an automobile. The trial judge instructed the jury that culpable meant blameworthy. The judgment was reversed because of the instruction. In the opinion the court said:

"[2] The word 'culpable,' in the phrase 'culpable negligence,' is something more than a mere epithet; it suggests or indicates some such meaning as criminal, and its use was intended to mark a distinction of some sort between the negligence which is merely a tort, paid for by money damages, and the negligence which is a crime, an offense against society, which must be paid for by penal punishment. The same negligent act may be both a tort and a crime, but there may be negligent acts that are torts, and not crimes.

"'A distance separates the negligence which renders one criminally liable from that which establishes civil liability.' (*People v. Rosenheimer*, 209 N. Y. 115, 123, 102 N. E. 530, 533.) . . . 'The charge of manslaughter could be sustained only if the defendant's negligence reaches beyond the bounds of lack of skill and foresight, where civil liability begins, to a point where criminal liability is imposed because the negligence is not merely venal, but is "culpable," involving fault for which the state may demand punishment.' (*Brown v. Shyne*, 242 N. Y. 176, 183, 151 N. E. 197, 199, 44 A. L. R. 1407.)

. . . . . . . . . .

"[4] A charge under an indictment for culpable negligence should define negligence clearly, and then add that culpable negligence must be something more than that, consisting of aggravated facts and circumstances which, in the opinion of the jury, demand criminal punishment rather than mere civil liability." (p. 49.)

Further discussion of authorities would serve no useful purpose.

In recent times great effort has been made and much has been done to rationalize the common law; but we are not concerned here with the present-day question whether negligence is subjective or objective (Prof. Warren A. Seavey, 41 Harvard Law Review, 1), or whether negligence is conduct or a state of mind (Prof. Henry W. Edgerton, 39 Harvard Law Review, 849). Possibly Blackstone's "vicious will," which he said was essential to every crime, meant substantially "intention." It may be conceded that Lord Abinger's statement, "It is a maxim older than the law of England that no man is guilty unless his mind is guilty" (*Regina v. Allday*, 8 C. & P. 136), may, as Sir James Stephen said, look more instructive than it really is (2 Stephen, History Criminal Law, 95); and that there is a certain vagueness and variableness about the psychological element of crime called *"mens rea."* It is perfectly true that, on proper analysis, recklessness is not the same thing as negligence, under any correct definition. We must, however, accept the common-law manslaughter tradition as we found it when we adopted it.

We are familiar in civil cases with the kind of conduct which will authorize punitive damages, and will prevent interposition of the defense of contributory negligence. It is supposed to involve fault, just as guilt of crime subjecting the offender to punishment was supposed to involve a certain "wickedness." It is regarded as displaying greater culpability than negligence. The higher degree of culpability was essential to common-law manslaughter resulting from negligence.

Turning to the instructions given, and leaving out of consideration the tenth instruction, it is plain that what the lord chief justice of England warned against occurred in this case. Defendant was tried for culpable negligence, and not for manslaughter, and the theory was that if he was simply negligent he would be guilty. To approve the theory would be to strike from the statute the words "which would be manslaughter at the common law," and the statute may not be so emasculated.

Turning to the tenth instruction, it will be observed the court submitted to consideration of the jury several kinds of conduct, each one of which, if it caused death, would constitute manslaughter: (1) Driving at a greater rate of speed than forty miles per hour, the statutory limit; (2) driving at a greater rate of speed than was reasonable and proper; (3) driving at such rate of speed as to endanger life and limb. Each kind of driving was a misdemeanor punishable by fine of not more than $1,000, or by imprisonment in the county jail not more than six months, or by both such fine and imprisonment. (Laws 1925, ch. 84.) Kinds two and three might, according to the circumstances, amount to misdemeanor if the driver were going at five miles per hour, or even more slowly. Under no circumstances should the rate exceed forty miles per hour. The result was that defendant may have been convicted, without regard to the circumstances, other than cause of death, because he was driving at more than forty miles per hour. If he was thus violating the speed law, he was committing an unlawful act, made so by statute enacted for the express purpose of protecting life and limb; and if Wood's death would not have occurred except for the unlawful driving, defendant would be guilty of manslaughter at common law.

The circumstance that Wood was guilty of contributory negligence in getting under the rear of Cohenour's car, standing at night on the traveled part of the highway without a red light, was a cir-

cumstance to be considered by the jury in determining whether death was or was not caused by the unlawful driving; but the circumstance did not of itself relieve defendant of liability. The instruction given the jury on that subject was not well drawn, but it embodied a correct view of the law.

It may be suggested here that it may not be left to the jury to say whether a defendant should be punished, in the sense that the jury may determine the law. The court must tell the jury what the law is, and in doing so must define terms that need definition, in order that the jury may comprehend the law. The jury then find the facts and apply the law.

In defining common-law manslaughter it should not be necessary to fill instructions with "epithets." The term "reckless" is not an epithet, but a descriptive adjective. The term "recklessness" is a fairly understandable noun. Under the statute, as applied to automobile drivers, negligence is not merely conduct which fails to conform to the familiar, common standard, the conduct of a reasonable man under like circumstances. Negligence is conduct which is induced by recklessness, and which involves undue risk of harm. To be reckless, conduct must be such as to evince disregard of or indifference to consequences, under circumstances involving danger to life or safety of others, although no harm was intended.

The views which have been expressed will not require any change in the manner of pleading manslaughter. Paradoxical as it may seem, manslaughter committed by act, procurement or culpable negligence, which would be manslaughter at common law, is a statutory crime, and the information may charge killing by unlawful act, or by culpable negligence, stating the facts.

The judgment of the district court is reversed, and the cause is remanded for a new trial.

## INSTRUCTIONS TO THE JURY.

Instructions to the jury, which are hereby made a part of this opinion, are instructions No. 3, No. 9, No. 10 and No. 11, attached hereto.

### INSTRUCTION No. 3.

This action is being prosecuted under section 21-420 of the Revised Statutes of Kansas for 1923, which reads as follows: "Every other killing of a human being by the act, procurement or culpable negligence of another, which would

be manslaughter under the common law, and which is not excusable or justifiable, or is not declared in this article to be manslaughter in some other degree, shall be deemed manslaughter in the fourth degree."

Fourth degree manslaughter is the lowest degree of manslaughter provided for by our statute, and·it is the degree of manslaughter which is charged in the information in this case, and therefore there is no other offense under which the defendant can, in any view of the case, be convicted, and it is unnecessary for you to consider any of the other degrees of the offense of manslaughter.

Under no view of this case can the acts of the defendant be excusable· on the ground that it is justifiable, under our law.

A homicide is excusable when committed by accident or misfortune, in either of the following cases: First, in lawfully correcting a child, apprentice, servant, or in doing any other lawful act by lawful means, with the usual and ordinary caution, and without unlawful intent. Second, in the heat of passion, upon any sudden or sufficient provocation, or upon sudden combat, without any undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel and unusual manner.

Common law manslaughter was divided into two degrees, voluntary and involuntary. Involuntary manslaughter, such as this defendant is charged with, consists in the killing of another without malice, or unintentionally, but in doing some unlawful act, not amounting to a felony, nor naturally tending to cause death or great bodily harm, or in negligently doing some act, lawful in itself, or by the negligent omission to perform a legal duty.

Chapter 84 of the Laws of 1925 provides: That no person shall operate a motor vehicle on any highway at a rate of speed greater than forty miles per hour, or greater than is reasonable and proper, having regard for the traffic and use of the road and the conditions of the road, nor at a rate of speed such as to endanger the life or limb of any person.

"Culpable negligence," as that term is used in the information in this case and in our law, is the failure to do something which a reasonable and ordinarily prudent man would do, or the doing of something which such a man would not do, under the circumstances surrounding the particular case. It is that failure to exercise that degree of care which is required in a particular instance, though the party may have exercised some care, but of a less degree than a reasonably prudent man, under the same circumstances, would have exercised.

### INSTRUCTION No. 9.

Some evidence has been introduced in this case concerning the Cohenour car being stopped in the public highway, without displaying a red rear light, as required by·law, and also concerning the ability of the defendant to see ahead of his car, on account of dust clouds and bright lights from other cars that he was meeting, at or about the time of the collision.

You are instructed in this connection, that it is not unlawful, neither is it negligent, for a person to stop his automobile in the public highway in order to make temporary repairs thereon, having due regard for the position his car occupies in the road when stopped for such purpose, but that it is negligence on the part of a party stopping an automobile in the public highway in the night-time, without having two front white lights and a red light upon the rear of his

automobile; and it is also negligence for a party to drive an automobile upon the public highway in this state when he is unable for any reason to sufficiently clearly see the road ahead of him, or in proceeding faster than the conditions would ordinarily warrant for him to safely proceed, having due regard for all the conditions and circumstances surrounding him and the rights of others using such highway.

In connection with the contributory negligence attributed to the deceased by the evidence in this case, I instruct you that contributory negligence is not available as a defense in a criminal prosecution for homicide caused by gross and reckless misconduct or culpable negligence of the accused. Although the evidence concerning the decedent's behavior, movements, position and the circumstances surrounding him, have been received in evidence, it is received for one purpose only, and that is for whatever it may be worth to you as material evidence bearing upon the question of the defendant's guilt. Notwithstanding the contributory negligence imputed to the decedent, if you find and believe beyond a reasonable doubt, that he came to his death by reason of the culpable negligence of the defendant, or by lawful acts of the defendant unlawfully done, and further find that such negligence or acts upon the part of the defendant was the cause of the decedent's death, then and in that event the defendant is responsible under the criminal law, whether the decedent's failure to use due care contributed to his injury or not.

INSTRUCTION No. 10.

If you find and believe from the evidence, beyond a reasonable doubt, that on the night of September 7, 1927, at the place alleged in the information, the defendant was driving an automobile on the public highway of Seward county, Kansas, and that he was driving said automobile at a rate of speed greater than forty miles per hour, or greater than was reasonable and proper, having regard for the traffic, the use of the road and conditions of the road, or at such a rate of speed as to endanger the life or limb of persons being in, upon or using said road, and that while so operating and driving said automobile said car ran against, upon or over the body and person of Clyde Wood, whereby the said Clyde Wood was thrown and carried with great force and violence upon the ground and against another automobile then and there being in said highway, and received divers mortal wounds, bruises and contusions upon and about the head, neck and body of the said Clyde Wood, thereby causing the death of the said Clyde Wood, and that said death would not have resulted except for the unlawful driving of said car as aforesaid, by the defendant, then and in that event the defendant would be guilty of manslaughter in the fourth degree.

But if you do not so find and believe, beyond a reasonable doubt, the defendant would not be guilty of any offense under this view of the case.

INSTRUCTION No. 11.

You are further instructed that if you find and believe, from all of the evidence, facts and circumstances in the case, that at the time and place alleged in the information the defendant did, by any act, procurement or culpable negligence on his part, as those terms have hereinbefore been defined to you, run and operate an automobile upon a public highway, as alleged in the information, and further find beyond a reasonable doubt, that while the de-

fendant was so operating said car, the same was carelessly and negligently run against, upon and over the body and person of Clyde Wood, and further find that the said Clyde Wood was thrown and carried with great force and violence upon the ground and against another automobile being in said highway, and thereby inflicted divers mortal wounds, bruises and contusions upon the head, neck and body of the said Clyde Wood, and that he, the said Clyde Wood, died from the effects thereof, and further find that the collision of said automobile with the body and person of the said Clyde Wood would not have happened had not the defendant been operating his motor car in such a careless and negligent manner, and at a rate of speed greater than was reasonable and proper, having due regard for the traffic and use of the road and the conditions of the road, and of all the conditions that existed at that time, regardless of whether such rate of speed was in excess of forty miles per hour or not, then and in that event the defendant is guilty as charged in the information, and you should so find by your verdict.

But if you do not so find and believe, beyond a reasonable doubt, or if you should find and believe that the collision of the defendant's motor car with the body and person of the said Clyde Wood was the result of an accident or misfortune, and that the defendant was not guilty of culpable negligence on his part, and was not operating his automobile at a rate of speed greater than permitted by the law of the state, as hereinbefore defined to you, then the defendant would not be guilty of any offense under the information in this case and you should acquit him.