STATE *v.* HENRY E. BENTON.

2

*(July* 31, 1936.)

LAYTON, C. J., HARRINGTON and RODNEY, J. J., sitting.

*P. Warren Green,* Attorney-General, and *Robert H. Richards, Jr.,* Deputy Attorney-General, for the State.

*Dudley C. Lunt* for the defendant.

4

Court of Oyer and Terminer for New Castle County, No. 83, May Term, 1936. Indictment for Involuntary Manslaughter.[1]

---

[1] For an indictment based on somewhat similar facts and drawn with great particularity, see *Reg. v. Pargeter*, 3 *Cox* (*Cr. Cas.*) 191.

LAYTON, C. J., delivering the opinion of the Court:

In the instructions to the jury, after stating the contentions of the defendant, it was said:

"These contentions of the defendant, if found to be sustained by the evidence, do not amount to a defense to the charges contained in the indictment; but, nevertheless, it is for you to determine from all the facts and circumstances before you whether the State has established the guilt of the defendant beyond a reasonable doubt under the law as it will be explained to you."

Thereafter, upon the court's own motion, the jury were recalled. Their attention was directed specifically to the above statement, and they were told to disregard it entirely, for the reason that it might be considered as a charge on the facts. The Court then proceeded to say:

"In a case like the present, under this sort of an indictment, the jury are entitled to consider all of the facts and circumstances existing at the time of the fatal occurrence to determine whether or not the omission of duty on the part of the defendant was such as is to be considered culpable negligence. By 'culpable negligence' I mean such negligence as is regarded as incompatible with human life and safety."

The defendant, however, insists that a new trial should be granted for the reason that the first instruction caused prejudice and injury which were not removed by the subsequent action of the Court.

In answer to this contention it is sufficient to say that the court has the power, and it is its duty to withdraw or to correct its instructions to the jury if, upon reflection, it considers that an erroneous instruction has been given. 16 *C. J.* 1055; *State v. Derry,* 118 *Me.* 431, 108 *A.* 568, where it was said that this power in the court is beyond dispute; *State v. Hood,* 63 *W. Va.* 182, 59 *S. E.* 971, 15 *L. R. A. (N. S.)* 448, 129 *Am. St. Rep.* 964, where the court said that it must assume that the jury can understand the direction of the judge, and that they have the capacity to remain uninfluenced by an instruction afterwards eliminated.

In some circumstances there may be error in instructions of such character that it is impossible to correct its harmful effect. It may readily be conceived that where the evidence is in close conflict, or of an intricate or circumstantial character, from which reasonable men may draw different inferences, an expression of opinion by the court, even though withdrawn, may well be considered as having caused incurable injury for the reason that the opinion has become firmly lodged in the minds of the jury, and has swayed them.

But, the evidence on the part of the State was not controverted. The defendant admitted a service of many years as a crossing watchman, and a service of several years at the crossing in question. There was no suggestion that he did not understand his duties, or that they were of a difficult character. He admitted that he did not put into operation any of the safety devices provided for the protection of travelers on the highway. Whether he went to sleep as he admits he told the police, or whether he was awake, but looking in one direction because of his belief that the next train would approach from the east, makes no difference. He admitted that a train approaching from

the west, at the rate of speed ordinarily maintained, was in sight for one minute before reaching the crossing. When asked why he did not see the train, he replied that he was looking the other way because he was expecting a train from the east for the reason that the telephone bell rang in his watchbox indicating as he said, a call from one signal tower to another which was usually followed by a train from the east. And further, he testified, and his statement is illuminating:

"Of course, as a general rule, and not being a custom to have two electrics right close together, I didn't see this train until it was on me."

He testified to the heavy vehicular traffic and to the noise made by trucks on the highway. This, of course, may have prevented his hearing the approach of the train, but it in nowise excused his failure to keep a lookout for the approach of trains from either direction.

His own summing up of the cause of the tragedy best tells the story. He testified:

"Well it is just the case of an accident, that is all. It is only one minute, practically speaking, from the time he was in sight until he was on the crossing and in that minute I happened to be looking the other way. That is the whole story, to be truthful about it."

We may conceive of a crossing where, its watchman is immersed in such difficulties because of the frequent passage of trains, or the inability to see the approach of trains, or from other conditions, that an omission of duty may be excusable in the sense that it is not to be punished criminally, for the reason that a man of ordinary care, activity and quickness of perception cannot, because of human limitations, efficiently accomplish that which his employment demands of him. But the evidence here shows no such difficulties. The passage of trains was infrequent, the next preceding train having passed the crossing over one-half hour before the fatal collision. There was no reason why if he could not rely upon his sense of hearing, he could not

see. He did not see because he did not look. He did not look, if his testimony on the witness stand is to be believed, because of an entirely unreasonable belief that the next train would approach from the east, a belief which he had no right to entertain. His employment was to keep a look-out for the approach of trains from either direction, not to indulge in speculation that a train would approach from one direction.

The defendant offered no defense in point of fact or of law, and while the instruction first given, although precisely true, may be regarded as an expression of opinion on the facts, we are agreed that the subsequent action of the court prevented prejudicial and injurious consequences, for reasonable men could have found no other verdict under the evidence. The omission of duty was more than mere negligence. It was conduct incompatible with human life and safety, and there is nothing in the record to mitigate, alleviate or excuse the failure to observe the approach of the train to the crossing, and to give the warnings required of him by his employment.

The court declined to charge the jury, as requested, that if the defendant, acting honestly on reasonable grounds, made a mistake as to the nature of his duty, his omission was not criminal or felonious, for the reason that the facts did not justify the charge. There was no evidence of a mere mistake as to the nature of his duties, and no basis for a reasonable man to believe that the next train would approach from the east, and there was nothing to suggest that performance of duty was impossible or even difficult. See *Reg. v. Trainer,* 4 *F. & F.* 105, 176 *Reprint* 488; *Reg. v. Elliott,* 16 *Cox* 710; *Reg. v. Pargeter,* 3 *Cox* 191.

The defendant's next contention is that the charge to the jury eliminated from their field of consideration any question of the degree of negligence. It is said that the

jury must have understood from the charge that any default must lead to criminal liability. This contention seems to be based upon the fact that the charge did not define negligence.

In defining involuntary manslaughter, this was said generally in an effort to make clear to the jury the nature of the charge:

"Involuntary manslaughter, on the other hand, is where the killing is unintentional and undesigned, and these unintentional or undesigned killings, at the same time unlawful killings, fall generally into two classes: first, where the death results from the doing of an unlawful act, not in itself amounting to a felony or tending to do great bodily harm; and second, in cases of negligence, where although there was no intent or purpose to kill, there was the doing or the omission to do some act, which doing or omission was attended with circumstances endangering life. It is the last form or class of involuntary homicide which is charged in this indictment, and the State contends, under the law, that the defendant is guilty of manslaughter of the involuntary kind, because, as it contends, the defendant negligently and carelessly omitted to do those things which were especially charged upon him to do and upon which the public generally, and the deceased, in particular, had the right to rely, whereby those using the highway at the time, including, of course, the deceased, were endangered."

This part of the charge informed the jury, and we think sufficiently, of the nature and character of involuntary manslaughter in general, and in particular, of the kind of involuntary manslaughter charged against the defendant.

The charge then proceeded:

"It is not all acts of negligence, whether acts of omissions or acts of commission that will constitute crime. Sometimes the courts have said that the negligence must be culpable or gross negligence. Others have said that the negligence must be such as to show a reckless disregard of the safety of others, or a conscious indifference to the consequences. All such expressions mean only that in order to hold one a criminal for his negligent conduct, his negligence must be something more than is required to hold him responsible in a civil proceeding."

"To warrant a conviction of involuntary manslaughter arising out of a negligent omission of duty, it must appear that a death was not improbable under the circumstances, or, to express the same thought in other language, it must appear that the omission of duty was one likely to cause death. In other words, the degree of

care to be exercised must be proportionate to the probability of danger to life impending from the act of omission."

"It is incumbent upon the State to satisfy you beyond a reasonable doubt of four things: First, that by virtue of his employment as a crossing watchman by the railroad in question the defendant, at the time and place, was charged with a specific legal duty to the deceased as a traveler on the highway;

"Second, that he failed and neglected to perform that duty;

"Third, that his failure, neglect or omission of duty evinced such a degree of carelessness as was incompatible with human life, or in other words, the omission of duty was in the circumstances likely to cause death;

"Fourth, that the failure, neglect or omission of duty was the proximate or efficient cause of the death of the deceased."

The defendant urges that negligence in the abstract should have been defined, for the jury was not told what negligence is required to make one responsible in a civil proceeding. It is said that the uninformed lay mind could only conclude that where the possibility of death exists any default suffices.

This interpretation by counsel is not justified by the language of the charge. It is true that the jury were not told what negligence is required to hold one responsible in a civil proceeding, but they were not told that, if any possibility of death existed in the circumstances, any default would be criminal negligence, nor could such inference be drawn legitimately from the language used.

The instruction was that the degree of care to be exercised must be proportionate to the probability of danger to life impending from the act of omission, and that to warrant a conviction of manslaughter arising out of a negligent omission of duty it must appear that the omission was likely to cause death; and, specifically and particularly, they were instructed that the omission of duty must be such as to evince that degree of carelessness as was incompatible with human life, or was such as was likely to cause death. See *State v. Harrison*, 107 *N. J. Law* 213, 152 *A*. 867.

That one could be held criminally responsible for an omission of duty where a mere possibility of death existed was not suggested. Nor do we think that that failure to point out to the jury what degree of negligence is required to render one responsible in a civil proceeding made the explanation of criminal negligence unintelligible.

The authorities cited by the defendant in nowise, as we think, support his view of the charge here. Nothing need be said with respect to *People v. Gardiner,* 303 *Ill.* 204, 135 *N. E.* 422, 423, and *State v. Williams,* 131 *S. C.* 294, 127 *S. E.* 264. A casual reading of the cases is sufficient to exclude them from consideration.

*State v. Custer,* 129 *Kan.* 381, 282 *P.* 1071, 67 *A. L. R.* 909, and *People v. Angelo,* 219 *App. Div.* 646, 221 *N. Y. S.* 47, were indictments under statutes having as was said, catch-all provisions that "every other killing  *  *  *  by the  *  *  *  culpable negligence of another, which would be manslaughter at the common law  *  *  *  shall· be deemed manslaughter in the fourth degree." *Rev. St. Kan.* 1923, 21—420.

In *State v. Custer,* culpable negligence was defined to be the failure to do something which a reasonable and ordinarily prudent man would do, or the doing of something which such a man would not do, under the circumstances.

The reviewing court well said that the defendant was tried for culpable negligence, and not for manslaughter, and the theory was that if he was simply negligent he would be guilty.

In *People v. Angelo,* 219 *App. Div.* 646, 221 *N. Y. S.* 47, the instruction was so phrased that the jury might have understood the court to suggest that slight negligence and culpable negligence meant the same thing.

In *Rex v. Bateman,* 28 Cox 33, the defendant, a physi-

cian, was indicted for manslaughter for having caused the death of a patient whom he was attending in child birth. It was his duty, of course, to exercise that degree of care which was, in his profession, fair and reasonable. The judge made use of the terms "gross negligence," "grave, wicked neglect," and "culpable neglect," without further explanation; and so it was that the Lord Chief Justice said that if these adjectives had been put aside, the summing up amounted to a direction to the jury that they must draw the line between mistake and error on the one hand and carelessness and incompetence on the other.

The conviction was set aside for failure of proof, not for misdirection, for it was distinctly said that as there was frequent use of some of the adjectives which have always been employed in explaining criminal negligence, looking at the charge as a whole, there was no misdirection. The court proceeded to say that the explanation of criminal negligence to a jury should not be a mere question of epithets, and that the issue is felony or no felony, not negligence or no negligence.

Where the explanation of the kind of negligence which is denounced as a crime is confined to prefixing to the word epithets, such as "culpable," or "gross," or "wicked," it may be readily admitted that the layman is not informed at all, for he does not know the significance given in law to the adjectives. It may be admitted also that where the charge amounts to a direction to the jury that they must draw the line between mistake or error of judgment on the one hand and carelessness or incompetence on the other hand, it is not adequate on a trial of an indictment for manslaughter.

In the instant case, however, while the explanation of the accusation may well be considered to fall short of that excellence which the critical mind demands, the explanation of criminal negligence was not allowed to depend upon

epithets, nor was the jury instructed to differentiate between mistake or error of judgment and mere carelessness or incompetence, nor was it suggested that slight negligence meant the same thing as culpable negligence.

It was made sufficiently clear to the jury that an element of the crime of involuntary manslaughter, such as was charged in the indictment, was an omission of duty in circumstances evincing such a degree of carelessness as was likely to cause death, and that the State had to prove that element beyond a reasonable doubt.

It must be remembered that there was no dispute as to the defendant's duties, or as to his omissions of duty. It was not that the defendant did something but not all that he should have done. It was not a case of mistake or error of judgment under stress of circumstance. The defendant did nothing. His sole explanation, despite the rule with which he admitted he was acquainted, that a crossing watchman must suppose a train to be due at his crossing every minute during his period of duty, was that he thought the next train would be from the east, and therefore he did not look to the west.

That a death was not improbable under the circumstances, and that the probability of death should have been within the reasonable apprehension of the defendant is beyond cavil. See 29 *C. J.* 1154.

Again the defendant contends that "proximate" or "efficient" cause was not explained to the jury, and therefore there was error. One of the defendant's prayers, in effect, requested an instruction that the jury should consider all the testimony offered on behalf of the defendant which tended to show that there were other factors operating, or that the circumstances were such, or both other factors and circumstances were so operating, that the homi-

cide would have resulted irrespective of the defendant's failure to act. Another requested instruction was that it must appear that "the death was directly caused by the defendant's reckless failure to act, and that there existed no other factors or circumstances which, irrespective of the defendant's conduct, would have so resulted."

These requests were not complied with for the reason that, in the opinion of the court, there were no other factors which reasonably could be said to enter into the cause. In the determination of proximate cause common sense is not to be eliminated. See *Island Express v. Frederick,* 5 *W. W. Harr.* (35 *Del.*) 569, 171 *A.* 181; *Szymanska v. Equitable Life Ins. Co.* (*Del. Super.*), 7 *W. W. Harr.* (37 *Del.*) 272, 183 *A.* 309. There are many cases in which the evidence may point to antecedent, intervening or concurring causes, and in such cases detailed instructions with respect to proximate cause may well be required. Not so here. There was no evidence that the car in which the deceased was riding was being driven at an unlawful or immoderate rate of speed. There was no evidence that the occupants of the car were familiar with the crossing. They both were killed and the presumption is that they exercised due care. The conduct of the occupants of the automobile is eliminated as a factor. The evidence was uncontradicted that the train approached the crossing at a speed not exceeding 15 miles per hour. The next preceding train passed over one-half hour before. According to the defendant's own testimony the train, at the ordinary rate of speed, was in sight for a minute before reaching the crossing. So the possible factors of the speed of the particular train, the frequency of trains, and the ability to see it approach in time to protect the crossing are eliminated as factors operating, either singly or together, as causes.

The injurious omission was not denied. The connection between it and the fatality was not enfeebled by an

intervening act or agency. 1 *Thompson Neg.* 48. An efficient, adequate cause was disclosed by the defendant's own testimony. There was no other independent intervening or concurring cause shown. An efficient adequate cause being found it must be considered as the true cause, unless another, not incident to it, but independent of it, is shown to have intervened between it and the result. 1 *Thompson Neg.* 51; 50 *C. J.* 840.

In such case a detailed explanation of proximate cause is not necessary for the reason that it affords no help to the jury in a proper understanding of the issue before them.

No useful purpose will be served by an analysis of the cases cited by the defendant. *Delaware & Hudson Co. v. Ketz (C. C. A.),* 233 *F.* 31; *Fair v. Floyd et al. (C. C. A.),* 75 *F.* (2d) 920; *Reg. v. Gregory,* 2 *F. & F.* 155, 175 *Reprint* 1002; *Reg. v. Ledger,* 2 *F. & F.* 858, 175 *Reprint* 1319; *Reg. v. Elliott,* 16 *Cox* 710. They appear to be cases where causes other than the one attributed to the defendants were in some degree operative.

The defendant, in his brief, assumes as a fact that there were two independent forces operated by agents unconnected with the defendant. That is the source of his error.

It is contended that the indictment fails to charge the defendant with an indictable offense for the reason that the duty imposed upon him was not such as will support an indictment for the death alleged to have resulted from the omission of duty.

It is sufficient to say that a charge of manslaughter may be predicated upon a failure to act as well as upon an act. 29 *C. J.* 1158. Whenever death is shown to have been the direct and immediate result of an omission to perform a duty imposed by law or contract, the person charged with the performance of the duty will be deemed guilty of culpable homicide. 13 *R. C. L.* 855; 1 *Wharton Cr.*

*Law* (*12th Ed.*), §§ 167, 455. The duty must be a plain duty, that is, it must be one that does not admit of doubt as to its obligatory force. It must be a duty imposed upon the defendant personally, and it must be one which he is bound to perform by law or contract. 29 *C. J.* 1158; 13 *R. C. L.* 855; 1 *Wharton Cr. Law* (*12th Ed.*), §§ 167, 455; *State v. O'Brien,* 32 *N. J. Law* 169.

The indictment charges a plain personal duty imposed upon the defendant by virtue of his contract of employment, and an entire failure to perform that duty. No more need be said.

But, it is also contended that the indictment does not plainly and fully inform the defendant of the nature and cause of the accusation against him, as required by the constitutional and statutory provisions.

■ Specifically, it is said that the indictment fails to allege whether the defendant was present at the time and place of the homicide, or whether he was under a duty to be there and that he was absent therefrom in violation of that duty. This complaint needs little comment. The indictment sufficiently charges his employment on the day alleged as a watchman at the crossing and his failure to perform his duties. We think that the defendant does not mean seriously to urge that the indictment lacks clarity in this respect.

Generally, it is said that the indictment fails to allege facts sufficient to support the conclusion that the defendant's conduct was unlawfully and feloniously careless.

■ ■ Both the prosecution and the defendant have discussed the constitutionality of statutes permitting short form indictments, and to little purpose. The statute cited was enacted for the purpose of allowing the omission of the old forms and phraseologies required in a common law indictment. It requires that the defendant shall be plainly and

fully informed of the nature and cause of the accusation against him. *State v. Vandegrift,* 3 *W. W. Harr.* (33 *Del.*) 154, 132 *A.* 858. It is not therefore a short form statute in any precise sense.

Every essential element of the crime must be averred. That was the rule of the common law. It is confirmed by the statute. The inquiry must be, therefore, whether the indictment contains a plain statement of the elements of the crime of involuntary manslaughter arising out of an omission of specific duty, in language sufficient plainly and fully to inform the defendant of the nature and cause of the accusation against him.

The defendant's argument is that where negligence, resulting in death, occurs in the performance of a lawful act, the indictment must set out with the utmost clearness the facts upon which the criminal negligence is predicated, *United States v. Geare,* 54 *App. D. C.* 30, 293 *F.* 997, and that the indictment at bar does not measure up to the requirement

It is difficult to understand the legal force and effect of the word "utmost." It is a superlative, and has no especial significance. If an indictment avers every element of an offense in language sufficient plainly and fully to inform the defendant of that which he has to meet it is sufficient, although its clearness of meaning may not attain the height of "utmost." However, it is not the rule but the application of it that causes difficulty. It will not be contended that inferences, conjectures and conclusions will supply insufficiencies of factual allegation, but the authorities cited by the defendant, when applied to the indictment before the court, are of little assistance. *State v. Kreuger,* 1 *W. W. Harr.* (31 *Del.*) 118, 111 *A.* 614, held only that an averment of unreasonable speed in the operation of a motor vehicle was insufficient, for the reason that the defendant

was entitled to be informed of the circumstances and conditions which served to make the speed unreasonable. *State v. Gray,* 38 *N. M.* 203, 30 *P.* (*2d*) 278, *State v. Sexsmith,* 200 *Iowa* 1244, 206 *N. W.* 100, and *Kimmel v. State,* 198 *Ind.* 444, 154 *N. E.* 16, involved prosecutions for deaths caused by negligent operation of motor vehicles. In the first two cases the indictment averred no facts at all upon which the criminal negligences were predicated, and in the last case the averment of fact was clearly insufficient.

These cases, as the defendant observes, were concerned with active conduct, while in the case at bar there is presented a case of inaction which is, as he says, *per se,* perfectly lawful. In such a case, it is contended, a higher degree of certainty is required.

"Inaction *per se* perfectly lawful" as applied to the averments of the indictment and the facts proved is a paradox. An act, lawful in itself, but negligently done, is an unlawful act. *Com. v. Hunt,* 4 *Metc.* (*Mass.*) 111, 38 *Am. Dec.* 346. One apparently inactive is actually doing something, even though that something is the abstinence from doing something else that he ought to have done. Even sleeping is an efficient act, and may become the object of penal prosecution when it operates to interrupt an act on the part of the defendant which the law requires of him with the penalty of prosecution for his disobedience. 1 *Wharton Cr. Law* (*12th Ed.*), § 167. Failing to look when required by duty to look is likewise an efficient act.

We think that no more certainty is required in charging manslaughter resulting from negligent inaction than from negligent action. There must be certainty in either case. The former case may present greater difficulty in averment.

We quite agree that the indictment must charge a neglect that is personal, and that the death must have been

the immediate and direct result of that personal neglect of duty. It is not enough that the defendant did not see to it that others did their duty. *Ainsworth v. United States,* 1 *App. D. C.* 518; *Regina v. Pocock,* 17 *Ad.* and *El. N. S.* 34.

In *Com. v. Hartwell,* 128 *Mass.* 415, 35 *Am. Rep.* 391, the defendant, a conductor of a train, was charged with involuntary manslaughter arising from his neglect to send forward a required signal before moving a train from a side track across another track upon which another train was approaching, whereby a collision occurred and a death resulted. The indictment charged him specifically with the knowledge that the other train was then due and about to arrive at the place in question. No evidence was offered in support of this averment. It was held that as the government had selected the precise ground upon which to stand in describing the nature and extent of the defendant's negligence, it must be held to the limits it had prescribed for itself. The court held it to be unnecessary to decide whether it would have been sufficient to allege, in general terms, a neglect of duty in not sending out a signal to warn any approaching train, without alleging that the defendant knew that the inward track was likely at any time to be used by an approaching train.

In *State v. MacDonald,* 105 *Minn.* 251, 117 *N. W.* 482, an engineer of a train, not the conductor, was charged with its management. The averment of criminal negligence was that he placed a part of a freight train on a main track when a passenger train was entitled to its exclusive use and right of way, it making its usual and ordinary run over the road. There was no averment that the defendant knew that a passenger train was due or was approaching. It was held that such allegation was necessary to constitute a complete offense. The fact that the conductor is supposed to

direct the movements of the train, not the engineer, undoubtedly was a consideration in the mind of the court.

*State v. Lowe,* 66 *Minn.* 296, 68 *N. W.* 1094; *State v. Smith,* 66 *Mo.* 92; *Com. v. Owens,* 198 *Ky.* 655, 249 *S. W.* 792, need no comment. Obviously in these cases there was averred no causal connection between the acts or omissions relied upon and the death, but rather conclusions drawn from insufficient facts.

The indictment upon which the defendant here was convicted charges the employment of the defendant, the duties cast upon him by virtue of his employment to give warning of the approach of trains to the crossing for the protection of the traveling public, and his personal neglect and omission to give the required warning, or any warning, either to the traveling public or to the deceased. We think that it will not be seriously contended that it was necessary to aver that the defendant knew that vehicles generally, or the vehicle in which the deceased was riding, were approaching the crossing.

"Warning" is an understandable word. As used in the indictment, it means notice, information or intimation of approaching or probable danger. The averment, that as a result of the negligent conduct of the defendant, the collision and loss of life occurred, can mean only that they occurred because the deceased was not put on guard by the defendant in accordance with his duty, fatal results flowing proximately from the breach of duty.

We are of the opinion that the indictment contains a plain statement of the elements of the crime of involuntary manslaughter arising out of an omission of duty in language sufficient plainly and fully to inform the defendant of the nature and cause of the accusation against him, within the purpose and meaning of the constitutional and statutory provisions cited.

The motion in arrest of judgment and for a new trial is denied.

HARRINGTON, J.:

The alleged defect in the indictment is apparent on the face of the record and that question is, therefore, necessarily before us on the defendant's motion in arrest of judgment (1 *Woolley's Prac.*, § 732, 750) ; and by an express statutory provision, under that motion, no formal defects can be taken advantage of. 1 *Woolley's Prac.*, § 750; *Graham, Adm'r, v. Cain*, 2 *Harr.* 97.

On a prior motion to quash, as has already been pointed out, I thought all of the counts of the indictment, on which the defendant was tried, were defective in form and bad on a motion of that character, but his rights under a motion in arrest of judgment are of a very different nature.

The jury has found the defendant guilty of man-slaughter and after a verdict, though essential allegations may not be stated with particularity ordinarily required by good pleading, every reasonable inference in favor of the sufficiency of the proof on which the verdict was based will be indulged in. *Layton v. State*, 4 *Harr.* 8; *Graham, Adm'r, v. Cain*, 2 *Harr.* 97; *Woolley's Prac.*, §§ 751-753; see, also, *Higgins v. Bogan*, 4 *Harr.* 330; *Hendrixen v. Huey*, 2 *Harr.* 301.

In *Layton v. State*, 4 *Harr.* 8, *supra,* the Court, in discussing this question, said:

"If the omission [in a pleading] be a mere defect in the form of stating the right or title, then the verdict and judgment would preclude the party from taking advantage thereof as error."

Quoting the language of Lord Mansfield in *Rushton v. Aspinall, Doug.* 658, the Court, also, said:

"We find the rule to be, that where the plaintiff has stated his title or ground of action defectively or inaccurately, because to en-

title him to recover all circumstances necessary in form or substance to complete the title so imperfectly stated, must be proved at the trial, it is a fair presumption after verdict, that they were proved; but that where the plaintiff totally omits to state his title or cause of action, it need not be proved at the trial, and, therefore, there is no room for presumption."

The material allegations of the indictment have already been set out, in substance, and without analyzing them, it is sufficient to say that they will sustain the verdict on a motion in arrest of judgment.