THE STATE OF MONTANA, PLAINTIFF AND RESPONDENT, *v.*
WILLIS W. DECKER, DEFENDANT AND APPELLANT.

No. 11917.
Submitted April 16, 1971.
Decided June 8, 1971.
485 P.2d 695.

Gene I. Brown, argued, and William E. Gilbert, Bozeman,
for defendant and appellant.

Robert L. Woodahl, Atty. Gen., Dave Gliko, Asst. Atty. Gen.,
argued, Helena, Jack Yardley, County Atty., John W. Mc-
Donald, Deputy County Atty., argued, Livingston, for plaintiff
and respondent.

MR. CHIEF JUSTICE JAMES T. HARRISON delivered the Opinion of the Court.

This is an appeal by the defendant Willy Decker from his conviction of involuntary manslaughter by reason of failure to obtain medical treatment for his wife. The case was tried in the District Court of Park County before a jury.

Briefly, defendant and his wife were owners and operators of Red's Bar in Clyde Park, Montana, and they were both heavy drinkers. According to defendant's statement about ten days before her death the deceased wife had fallen while going into the trailer house where they lived and in that fall broke her glasses, blackened her eye, and bruised herself. On the night before Thanksgiving deceased spent the evening from about ten p.m. until two a.m. the following morning in a bar known as the Clyde Park Bar. She was not accompanied by her husband and she spent this entire period of time drinking and dancing. She left this bar about two a.m. and walked to Red's Bar, about three hundred feet away. At around four or five a.m. defendant found his wife in the bar, sitting at a table, and she complained about a terrible headache. Defendant at that time was stocking beer coolers and while in a cooler he heard a crash and came out and found his wife on the floor. He went to help her and put her to bed. Later in the morning defendant called Bill Nelson, a friend with whom the Deckers were to have Thanksgiving dinner, and told Nelson that he could not make it because he could not get his wife up, that she had been out the night before and got intoxicated. Nelson told defendant to come anyway for dinner and defendant did. Defendant left the Nelson home at approximately six p.m. and at approximately seven p.m. he called Nelson and asked Nelson and his wife to come to Clyde Park and stated that Mrs. Decker was out on the floor in the barroom passed out and that he could not wake her. The Nelsons went to Red's Bar, found Mrs. Decker unconscious on the floor and Nelson testified:

"Well, we looked at her and it looked to me like she was

breathing plum fine. And I just took it for granted that she was passed out from intoxication. And so I said to Willy, I says the best thing we can do is take her over to the trailer house and get her in bed.''

The Nelsons and the defendant then took Hyacinth Decker into the adjoining trailer house which was used as a residence by the Deckers. Defendant told the Nelsons that if she was not better by morning he would call a doctor.

The next morning, at approximately nine a.m. Mr. Decker contacted a nurse living in Clyde Park. Mr. Decker got the nurse and brought her to his trailer house and at that time he appeared real worried about the condition of his wife. At that time Mrs. Decker was breathing, but with some problems. An ambulance arrived from Livingston and Mrs. Decker was taken to the hospital where she died at approximately 11:20 p.m. the following night.

The State introduced some evidence that on occasions remote from her death, the defendant and his wife had argued and fought and that the defendant had slapped his wife. The medical evidence established that there was no connection between those incidents and the death of Hyacinth Decker.

The medical evidence appearing in the record, in general shows that Mrs. Decker's general physical condition was poor; she had high blood pressure and cirrhosis of the liver, resulting from excessive drinking. One doctor testified that she died of a subdural hematoma which was spontaneous as a result of a vessel rupturing and was not caused by any trauma or any external force, although another physician questioned whether the hematoma was spontaneous and it was also his opinion that it was a safe assumption that they are invariably due to an external injury. The attending physician testitied that a subdural hematoma is difficult to diagnose because the symptoms are similar to those of intoxication and in this instance he had misdiagnosed what had occurred because there was no bruise on the skull; that one can become unconscious from drinking and you would be unable to tell whether somebody had passed

out from drinking or was having a stroke; that in view of what he knew about the condition of the deceased, her hypertension, liver problems, and other problems he had determined through his examination, he questioned whether surgery would have ever been a benefit to Mrs. Decker. There is some conflicting testimony offered by another physician, as heretofore referred to, but in answer to the specific question of whether or not earlier medical treatment would have prolonged Mrs. Decker's life, he stated that he had no opinion.

Does this evidence prove defendant guilty of the crime charged beyond a reasonable doubt? The following discussion of this issue is dispositive of this appeal.

Criminal negligence has been defined by this Court in State v. Mally, 139 Mont. 599, 366 P.2d 868, in the following language:

"The degree of negligence necessary to impose criminal liability for involuntary manslaughter was considered by this Court in State v. Powell, 114 Mont. 571, 576, 138 P.2d 949, 950, wherein the Court stated:

" 'The Montana statute * * * [section 94-2507, R.C.M. 1947] defines involuntary manslaughter as follows: "The unlawful killing of a human being, without malice. It is of two kinds: * * * 2. Involuntary, in the commission of an unlawful act which might produce death, *in an unlawful manner, or without due caution or circumspection.*"

" 'This Court has never defined what is meant by the italicized portion above, that is, what degree of negligence is necessary to impose criminal responsibility. This question, however, is well settled in other jurisdictions. The general rule is stated in 26 Am.Jur. page 299, as follows:

"The authorities are agreed, in the absence of statutory regulations denouncing certain acts as criminal, that in order to impose criminal liability for a homicide caused by negligence, there must be a higher degree of negligence than is required to establish negligent default on a mere civil issue. The negligence must be aggravated, culpable, gross, or reckless, that is, the conduct of the accused must be such a departure from what

would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard for human life or an indifference to consequences." ' "

Here we have a couple who operated a bar, both were hard drinkers. The night before the wife became unconscious she was present in another bar, drinking and dancing. She returned to her bar sometime following two a.m. and her husband found her sitting at a table complaining about a headache. She subsequently fell to the floor and her husband helped her and put her to bed. Defendant declined the dinner invitation because of his wife's intoxication but was urged to come anyway, which he did.

We find that when he first found his wife sitting at the table in the barroom he did what one would consider to be the proper thing, he put her to bed. There is no evidence that she became unconscious from the fall.

The next time defendant found his wife back in the bar was on his return from Thanksgiving dinner and at that time she was on the floor, passed out and he could not awaken her. At that time he called the Nelsons and they came over. Nelson, as he testified, thought she was intoxicated, was breathing as he put it "plum fine" and once again she was put to bed in the trailer house.

On this evidence can we say that defendant departed from the conduct of an ordinary and prudent man so as to have a disregard for human life or an indifference to consequences?

Willy Decker became concerned about his wife's condition the next morning and went and got a nurse, an ambulance was sent for and Mrs. Decker was taken to the hospital where she later expired.

Confronted as we are with the fact situation here, can we say that a man finding his wife in what he believed to be an intoxicated condition, knowing that she had spent the evening drinking and dancing, exhibits a disregard for human life by putting her to bed? Then when he found her again unconscious

on the barroom floor and sent for friends because he could not awaken her, does this show an indifference to consequences? We will concede that a reasonable and prudent man would not ordinarily leave an intoxicated or sick wife to attend a dinner at a friend's home, but he was urged to do so by his friend and did, but from the medical evidence produced this departure was not the cause nor did it contribute to the death of his wife. Much perhaps can be surmised in this cause but our law requires that proof of guilt must be beyond a reasonable doubt. It is our considered opinion that the evidence here falls short of establishing the guilt of the defendant beyond a reasonable doubt and the judgment of the district court should be set aside.

While defendant raises other issues there is no purpose in discussing them since the first issue we have already discussed disposes of the appeal.

The judgment of the district court is reversed and the cause remanded to the district court with directions to dismiss the information and release the defendant.

It is so ordered.

MR. JUSTICES JOHN C. HARRISON, HASWELL, DALY, and CASTLES, concur.