No. 99-055

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 22

298 Mont. 146

995 P. 2d 951

STATE OF MONTANA, ex rel.

BONNIE KUNTZ

Relator

v.

MONTANA THIRTEENTH JUDICIAL DISTRICT COURT,

YELLOWSTONE COUNTY,

The Honorable Russell C. Fagg, Presiding,

Respondent

ORIGINAL PROCEEDING FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone

The Honorable Russell C. Fagg, Judge presiding.

COUNSEL OF RECORD:

For Relator:

Vernon E. Woodward, Lance G. Lundvall, Hendrickson, Everson, Noenning & Woodward, Billings, Montana (Woodward argued)

For Respondent:

Joseph P. Mazurek, Montana Attorney General, Patricia J. Jordan, Assistant Montana Attorney General, Helena, Montana; Dennis Paxinos, Yellowstone County Attorney, Billings, Montana (Jordan argued)

For Amici Curiae:

John P. Connor, Jr., Helena, Montana; Tom Scott, Dillon, Montana (Montana County Attorneys Association); Daniel P. Buckley, Berg, Lilly, Antral & Tollefsen, Bozeman, Montana (Montana Association of Criminal Defense Lawyers)

_____

Heard: September 23, 1999

Submitted: October 21, 1999

Decided: January 27, 2000

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1.This is an original proceeding in this Court involving an application for a writ of supervisory control. On January 8, 1999, the District Court for the Thirteenth Judicial District, Yellowstone County, issued an Order denying Bonnie Kuntz's motion to dismiss or strike an amended information. The amended information alleged, under one charge, that Kuntz negligently caused the death of Warren Becker by stabbing and then failing to call for medical assistance. Kuntz contended that her affirmative defense of justifiable use of force nullified any conceivable duty she had to render aid to Becker following the stabbing, and therefore the portion of the information pertaining to her failure to summon medical aid should be amended or stricken. In denying Kuntz's motion, the District Court

stated that because Kuntz may have had such a duty, both she and the State would be permitted to argue whether her "actions after the stabbing tend to refute her claim of justification." Kuntz sought a writ of supervisory control and the State concurred. In an order dated March 23, 1999, this Court accepted original jurisdiction at the request of both parties. This Court concluded that the criteria set forth in Rule 17, M.R.App.P. and *Plumb v. Fourth Judicial Dist. Court* (1996), 279 Mont. 363, 927 P.2d 1011, were satisfied and that legal questions raised were ones of first impression.

¶2.The following issues were identified by our order, and have been briefed and orally argued by both parties:

**1. Does one who justifiably uses deadly force in defense of her person nevertheless have a legal duty to summon aid for the mortally wounded attacker?**

2. If a person who justifiably uses deadly force fails to summon aid for her attacker, is she criminally culpable for that failure?

3. Should the prosecution be permitted to argue that the defendant's actions following the use of deadly force may be considered by the fact-finder in making its decision as to the validity of the justifiable use of force defense?

4. Should the prosecution be permitted to argue that even if the defendant acted with justifiable use of force, her delay in seeking medical aid for the mortally wounded attacker was a factor in causing his death?

5. May the defendant's actions following an unjustified use of deadly force be alleged as facts supporting charging the offense of negligent homicide?

## Factual and Procedural Background

¶3.According to the amended information and supporting affidavit, Yellowstone County Sheriff's deputies were dispatched on April 19, 1998, to the home of Bonnie Kuntz and Warren Becker to investigate a reported stabbing. When the deputies arrived at the trailer house, Becker was dead from a single stab wound to the chest.

¶4.Kuntz, who was waiting for medical and law enforcement personnel to arrive, told the

deputies that she and Becker had argued the morning of April 18, 1998. At some point during the day, both parties left the trailer home. After Kuntz returned that evening, at or before midnight, a physical altercation ensued.

¶5.The alleged facts indicate that Kuntz and Becker, who had never married but had lived together for approximately six years, were in the process of ending what is described as a stormy relationship. When Kuntz arrived at the mobile home that night, she discovered that many of her personal belongings had been destroyed, the interior of the home "trashed," and the phone ripped from the wall. Kuntz told the deputies that she then went into the kitchen. There, allegedly, Becker physically attacked her, and at one point grabbed her by the hair, shook her, and slammed her into the stove.

¶6.Kuntz told the deputies that she could not clearly remember what happened, only that she had pushed Becker away and had then gone outside by the kitchen door to "cool off." When she thought that the fight was over, and that it was safe to go back inside, she returned to the kitchen. She discovered a trail of blood leading from the kitchen through the living room and out onto the front porch where she found Becker collapsed face-down on the porch. She alleges that she rolled him over. Becker was unresponsive.

¶7.Kuntz then alleges that she found Becker's car keys in one of his pockets, got in his vehicle, drove to a friend's house several miles away, and called her mother. Kuntz does not allege that she personally contacted medical or law enforcement personnel; rather, authorities were apparently summoned by Kuntz's sister-in-law, who lived next door to Kuntz's mother, sometime within an hour after the stabbing. Kuntz did return, however, to the trailer home where she waited for the deputies and medics to arrive.

¶8.On June 23, 1998, Bonnie Kuntz was charged with negligent homicide for causing the death of Warren Becker by stabbing him once in the chest. Although she admitted stabbing Becker and causing his death, Kuntz entered a plea of not guilty based on the defense of justifiable use of force.

¶9.On November 6, 1998, shortly before the scheduled trial date, the State filed an amended information charging the same offense but alleging that Kuntz caused the death of Becker by stabbing him once in the chest with a knife *and* by failing to call for medical assistance. Kuntz again entered a plea of not guilty. On December 18, 1998, Kuntz filed a motion to dismiss the amended information or in the alternative to strike the allegation that the failure to seek medical assistance constituted negligent homicide.

¶10. Following a hearing and briefing, the District Court issued an Order and Memorandum on January 8, 1999, denying Bonnie Kuntz's motion to dismiss the amended information.

¶11. Kuntz sought a writ of supervisory control and the State concurred. In an order dated March 23, 1999, this Court accepted original jurisdiction at the request of both parties.

## Standard of Review

¶12. A district court's denial of a motion to amend or strike a criminal information involves legal questions which we review *de novo*, determining only whether the court correctly interpreted the law. *See State v. Bowles* (1997), 284 Mont. 490, 492, 947 P.2d 52, 53.

## Discussion

¶13. Subject to this writ of supervisory control, we are asked to resolve several related, narrow issues that previously have not been addressed by this Court. Because the issues here have far-reaching implications with respect to the affirmative defense of justifiable use of force in Montana, as well as the duty to render medical aid, we find it necessary to first establish a workable framework of legal principles and rules under the laws of Montana and other jurisdictions before proceeding.

¶14. For criminal liability to be based upon a failure to act, there must be a duty imposed by the law to act, and the person must be physically capable of performing the act. *See* § 45-2-202, MCA. As a starting point in our analysis, the parties here have identified what is often referred to as "the American bystander rule." This rule imposes no legal duty on a person to rescue or summon aid for another person who is at risk or in danger, even though society recognizes that a moral obligation might exist. This is true even "when that aid can be rendered without danger or inconvenience to" the potential rescuer. *Pope v. State* (Md. 1979), 396 A.2d 1054, 1064 (quoting Wayne R. LaFave & Austin W. Scott, Jr., Criminal Law, at 183 (1972)). Thus, an Olympic swimmer may be deemed by the community as a shameful coward, or worse, for not rescuing a drowning child in the neighbor's pool, but she is not a criminal. *See* LaFave & Scott, Substantive Criminal Law § 3.3(a) (1986).

¶15. But this rule if far from absolute. Professors LaFave and Scott have identified seven common-law exceptions to the American bystander rule: 1) a duty based on a personal

relationship, such as parent-child or husband-wife; 2) a duty based on statute; 3) a duty based on contract; 4) a duty based upon voluntary assumption of care; 5) a duty based on creation of the peril; 6) a duty to control the conduct of others; and 7) a duty based on being a landowner. *See* LaFave & Scott, § 3.3, at 283-289. A breach of one of these legal duties by failing to take action, therefore, may give rise to criminal liability. Our review of the issues presented here can accordingly be narrowed to two of the foregoing exceptions as briefed by the parties and identified by the District Court: 1) a duty based on a personal relationship, and 2) a duty based on creation of the peril.

¶16.One of the lead authorities on the personal relationship duty arose in Montana. In the widely-cited case of *State v. Mally* (1961), 139 Mont. 599, 366 P.2d 868, this Court held that under certain circumstances a husband has a duty to summon medical aid for his wife and breach of that duty could render him criminally liable. The facts of the case described how Kay Mally, who was suffering from terminal kidney and liver diseases, fell and fractured both her arms on a Tuesday evening. Her husband, Michael Mally, put her to bed and did not summon a doctor until Thursday morning. "During this period of time, as she lay there with only the extended arm of death as a companion, she received but one glass of water." *Mally*, 139 Mont. at 608, 366 P.2d at 873. Although his wife ultimately died of kidney failure, Mally was found guilty of involuntary manslaughter, a forerunner of Montana's negligent homicide statute, because his failure to act hastened his wife's death. *See Mally*, 139 Mont. at 610, 366 P.2d at 874. *See also Territory v. Manton* (1888), 8 Mont. 95, 19 P. 387 (finding husband criminally culpable for leaving intoxicated and inadequately clothed wife outside in winter conditions overnight). *But see State v. Decker* (1971), 157 Mont. 361, 365-66, 485 P.2d 695, 698 (reversing involuntary manslaughter conviction of husband who, after finding his intoxicated wife unconscious on barroom floor, put her to bed and failed to summon medical aid until the next morning).

¶17.In *Mally*, however, we alluded to a limitation of this rule which is a point of contention between the parties here. We cited to *People v. Beardsley* (Mich. 1907), 113 N.W. 1128, which is favorably cited by Amicus. The Michigan Supreme Court concluded that the legal duty imposed on the personal relationship of husband and wife could not be extended to a temporary, non-family relationship. The court held that a married defendant had no duty to summon medical help for his mistress, who was staying in his house for the weekend, after she took morphine following a bout of heavy drinking and fell into a "stupor." *Beardsley*, 113 N.W. at 1131.

¶18.We agree with the State, as well as myriad commentators over the years, that although

not expressly disfavored in case law, *Beardsley* is indeed "outmoded," at least to the extent it should be distinguished. *See*, *e.g.*, Note, *Criminal Omissions*, 55 Harv. L. Rev. 615, 625 (1942) (suggesting that the law should protect the expectation found in certain personal relationships that "in an emergency a limited faith or trust will be honored"); Graham Hughes, *Criminal Omissions*, 67 Yale L. J. 590, 624 (1958) (stating that *Beardsley* "proclaims a morality which is smug, ignorant and vindictive"); Arthur Leavens, *A Causation Approach to Criminal Omissions*, 76 Calif. L. Rev. 547, 561 (1988) (criticizing the *Beardsley* court's "crimped" reading of legal duty). *See also State v. Miranda* (Conn. 1998), 715 A.2d 680, 682 (concluding that person who is not biological or legal parent of a child but who establishes a "familial relationship" with live-in girlfriend has duty to protect child from abuse); *Leet v. State* (Fla. App. 1991), 595 So.2d 959, 963 (concluding that the live-in boyfriend of a child's mother owed a legal duty to the child to prevent abuse by the mother after establishing a "family-like relationship" for an extended and indefinite period).

¶19. Applying the foregoing to the facts here, we conclude that Kuntz and Becker, having lived together for approximately six years, owed each other the same "personal relationship" duty as found between spouses under our holding in *Mally.* This duty, identified as one of "mutual reliance" by LaFave and Scott, would include circumstances involving "two people, though not closely related, [who] live together under one roof." LaFave & Scott, § 3.3(a)(1), at 285-286. To hold otherwise would result in an untenable rule that would not, under the factual circumstances found in *Mally*, impose a legal duty to summon medical aid on persons in a relationship involving cohabitation. Nevertheless, this holding is far from dispositive in establishing a legal duty under the facts presented.

¶20. We agree with the District Court that the duty based on "creation of the peril" is far more closely aligned with the factual circumstances here. Undoubtedly, when a person places another in a position of danger, and then fails to safeguard or rescue that person, and the person subsequently dies as a result of this omission, such an omission may be sufficient to support criminal liability. *See* LaFave & Scott, § 3.3(a)(5), at 288; *State v. Morgan* (Wash.App. 1997), 936 P.2d 20, 23 (imposing criminal liability for supplying cocaine leading to victim's overdose); *United States v. Hatatley* (10th Cir. 1997), 130 F.3d 1399, 1406 (imposing criminal liability for leaving victim badly beaten and shirtless in a freezing, remote desert).

¶21. This duty may include peril resulting from a defendant's criminal negligence, as alleged here. *See generally Mally*, 139 Mont. at 606, 366 P.2d at 872 (stating that failure

to obtain medical aid for one who is owed a duty is a sufficient degree of negligence as to constitute involuntary manslaughter). Likewise, a case cited by the State that arguably expands the spousal duty actually falls cleanly under this category as well. *See State v. Rees* (1910) 40 Mont. 571, 107 P. 893, 894 (stating that "even if deceased was not defendant's wife, if he was guilty of the assault, the legal duty rested upon him to protect, care for, and shelter her after that act to the same extent as though she had been his wife").

¶22. The legal duty based on creation of the peril has been extended in other jurisdictions to cases involving self-defense. *See King v. Commonwealth* (Ky. App. 1941), 148 S.W.2d 1044; *People v. Fowler* (Cal. 1918), 174 P. 892, 896, *overruled on other grounds by People v. Thomas* (Cal. 1945), 156 P.2d 7. A clear, conclusive articulation of the legal duty to render or summon medical aid following an act of self-defense, however, was not established in either of these cases.

¶23. The court in *King*, for example, reversed a conviction of voluntary manslaughter that was based on the appellant's refusal to give or permit others to give aid or medical attention. The court, in finding that jury instructions were improper and prejudicial, stated:

[S]ince the shooting was justified, appellant could not have been guilty of voluntary or involuntary manslaughter unless he had committed *some subsequent act* which converted a non-fatal injury into a fatal one. If the injury was fatal, nothing which appellant might have done could have changed the result, or lessened or increased his responsibility.

*King, 148 S.W.2d at 1047 (emphasis added). The facts do not reveal how the use of force came about, only that the appellant shot the decedent in the leg with a shotgun in the "necessary defense of appellant's father." King, 148 S.W.2d at 1046. Following the shooting, the Kings (father and son) carried the victim to their front porch and, futilely, attempted to stop the bleeding. The Kings did not have access to a phone or an automobile. Consequently, "[s]ome hours elapsed before the first-aid man and the constable arrived, and about 11:30 A.M. an automobile was procured [approximately five hours after the shooting]." King, 148 S.W.2d at 1046. Even though evidence showed that a physician could have been summoned more speedily, and that the appellant's father acted somewhat indifferently to the shooting victim's plight, the court concluded that the Kings had not committed a "subsequent act" in that they did not actually refuse to render or seek medical attention for the victim, and thus could not have been found guilty of voluntary manslaughter, which required an unlawful, willful act. King, 148 S.W.2d at 1046-47.*

¶24. The court in *Fowler* likewise suggested that if the defendant acted in justified self-defense when he struck the victim with a club--which the evidence demonstrated he did not-- the death that resulted from the victim being subsequently run over by an automobile

after being left lying "helpless and unconscious in a public road," would not give rise to criminal culpability. *Fowler*, 174 P. at 896.

¶25.As *King* and *Fowler* suggest, the legal duty imposed on personal relationships and those who create peril are not absolute; i.e., there are exceptions to these exceptions. The personal relationship legal duty, for example, does not require a person to jeopardize his own life. *See Mally*, 139 Mont. at 605, 366 P.2d at 871 (quoting *Beardsley*). *See also State v. Walden* (N.C. 1982), 293 S.E.2d 780, 786 (stating that although a parent has a legal duty to prevent harm to his or her child, "[t]his is not to say that parents have the legal duty to place themselves in danger of death or great bodily harm in coming to the aid of their children"). Furthermore, the duty does not arise unless the spouse "unintentionally entered a helpless state," or was otherwise incompetent to summon medical aid on his or her own behalf. *Commonwealth v. Konz* (Pa. 1982), 450 A.2d 638, 642 (citing *Mally*).

¶26.Similarly, the law does not require that a person, who places another person in a position of peril, risk bodily injury or death in the performance of the legally imposed duty to render assistance. For example, the crime of negligent homicide in Montana requires a gross deviation from a reasonable standard of care. *See* §§ 45-5-104, 45-2-101(42), MCA; *State v. Kirkaldie* (1978), 179 Mont. 283, 292, 587 P.2d 1298, 1304. In turn, what constitutes a reasonable standard of care must be guided by the principle that "[w]hat an ordinarily prudent and careful person would do under a given set of circumstances is usually controlled by the instinctive urge to protect himself from harm." *Burns v. Fisher* (1957), 132 Mont. 26, 33, 313 P.2d 1044, 1048 (citations omitted) (applying self-preservation principle to auto accident involving contributory negligence).

¶27.Therefore, where self-preservation is at stake, the law does not require a person to "save the other's life by sacrificing his own," and therefore no crime can be committed by the person who "in saving his own life in the struggle for the only means of safety," causes the death of another. 40 Am.Jur. *Homicide* § 116 (1999) (analyzing self-preservation in situations involving common peril). Even states such as Vermont that have adopted a "Good Samaritan Doctrine" which--contrary to the American bystander rule--imposes a legal duty to render or summon aid for imperiled strangers, do not require that the would-be rescuer risk bodily injury or death. *See*, *e.g.*, *State v. Joyce* (Vt. 1981), 433 A.2d 271, 273 (holding that Vermont's Duty to Aid the Endangered Act did not require bystanders to intervene in a fight, because such intervention would expose person to risk of sustaining an injury). Thus, although a person may still be held accountable for the results of the peril into which he or she placed another, the law does not require that he or she risk serious

bodily injury or death in order to perform a legal duty.

¶28.With these general principles in place, we now turn to the issues subject to the writ of supervisory control.

## Issue 1.

**Does one who justifiably uses deadly force in defense of her person nevertheless have a legal duty to summon aid for the mortally wounded attacker?**

¶29.Our analysis of this issue is narrowed to whether the legal duty to summon aid, based on the defendant's personal relationship or creation of peril, extends into circumstances where the defendant's alleged use of justifiable force places his or her aggressor in need of medical attention. The State contends that even if Kuntz's use of force was justified, a proven subsequent failure by her to summon aid could constitute a gross deviation from ordinary care. Thus, the State's amended information charging Kuntz with negligent homicide for stabbing Becker and then failing to immediately call for medical assistance was proper and should not be stricken. Although the use of force may be justified, to not hold such a person criminally accountable for the subsequent omission would, according to the State, "encourage revenge and retaliation."

¶30.Whether inflicted in self-defense or accidentally, a wound that causes a loss of blood undoubtedly places a person in some degree of peril, and therefore gives rise to a legal duty to either 1) personally provide assistance; or 2) summon medical assistance. *See Flippo v. State* (Ark. 1975), 523 S.W.2d 390, 393-94 (affirming involuntary manslaughter conviction of hunters for failing to timely summon aid following shooting accident). Even so, the performance of this legal duty, as discussed above, does not require that a person place herself at risk of serious bodily injury or death. *See Mally*, 139 Mont. at 605, 366 P.2d at 871; *Yockel v. Gerstadt* (Md. App. 1928), 140 A. 40, 42 (stating that "[u]nder any and all circumstances the law places upon a man the duty of exercising reasonable care for his own protection").

¶31.Accordingly, based on the legal principles gleaned from our analysis thus far, we hold that when a person justifiably uses force to fend off an aggressor, that person has no duty to assist her aggressor in any manner that may conceivably create the risk of bodily injury or death to herself, or other persons. This absence of a duty necessarily includes any conduct that would require the person to remain in, or return to, the zone of risk created by

the original aggressor. We find no authority that suggests that the law should require a person, who is justified in her use of force, to subsequently check the pulse of her attacker, or immediately dial 9-1-1, before retreating to safety.

¶32.Under the general factual circumstances described here, we conclude that the victim has but one duty after fending off an attack, and that is the duty owed to one's self--as a matter of self-preservation--to seek and secure safety away from the place the attack occurred. Thus, the person who justifiably acts in self-defense is temporarily afforded the same status as the innocent bystander under the American rule. *See Pope*, 396 A.2d at 1064 (stating general rule); LaFave & Scott, § 3.3(a)(5), at 288 (suggesting that "one who innocently creates danger is on principle in the same position as that of a bystander who happens by when a situation of danger has developed").

¶33.Finally, we conclude that the duty to summon aid may in fact be "revived" as the State contends, but only after the victim of the aggressor has fully exercised her right to seek and secure safety from personal harm. Then, and only then, may a legal duty be imposed to summon aid for the person placed in peril by an act of self-defense. We further hold that preliminary to imposing this duty, it must be shown that 1) the person had knowledge of the facts indicating a duty to act; and 2) the person was physically capable of performing the act. *See* LaFave & Scott, § 3.3(b), at 289 (stating prevailing view that person may not be held criminally liable where defendant is unaware of the facts giving rise to the duty to act); § 45-2-202, MCA (stating that a "material element of every offense is a voluntary act, which includes an omission to perform a duty which the law imposes on the offender and which he is physically capable of performing").

¶34.It must be emphasized, however, that once imposed, a proven breach of this legal duty may still fall far short of negligent homicide, pursuant to § 45-5-104, MCA, which requires a gross deviation from an ordinary or reasonable standard of care. *See Kirkaldie* (1978), 179 Mont. at 292, 587 P.2d at 1304. The limited circumstances under which such a breach may give rise to criminal culpability is addressed by the following issue.

## Issue 2.

## If a person who justifiably uses deadly force fails to summon aid for her attacker, is she criminally culpable for that failure?

¶35.This issue raises the possibility that after a person is found to have justifiably used

force, and reasonably exercised her right to secure her own safety, she may still be found criminally liable for the ultimate death the force caused. In other words, if the duty to summon aid may be revived, as we have just held, may the failure to perform this legal duty give rise to criminal liability, even though the underlying use of force was justified?

¶36.Our holding as to the first issue consequentially narrows the issue here. Accordingly, to find a person who justifiably acts in self-defense criminally culpable for negligently causing the death of the aggressor, the failure to summon medical aid must be the "cause in fact" of the original aggressor's death, not the justified use of force. *See State v. Bier* (1979), 181 Mont. 27, 32, 591 P.2d 1115, 1118. *See also King*, 148 S.W.2d at 1047 (requiring a subsequent act that converts non-fatal injury into a fatal one for the purpose of imposing criminal liability following act of self-defense).

¶37.In a recent wrongful death case, we stated the general rule governing whether conduct is a cause-in-fact of an event:

[A] party's conduct is a cause-in-fact of an event if "the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it."

*Gentry v. Douglas Hereford Ranch, Inc., 1998 MT 182, ¶ 25, 290 Mont. 126, ¶ 25, 962 P.2d 1205, ¶ 25 (quoting Prosser & Keaton on Torts § 41, at 266 (5th ed. 1984)). See also § 45-2-201(1)(a), MCA (stating that "[c]onduct is the cause of a result if . . . without the conduct the result would not have occurred"); LaFave & Scott, § 7.12(c), at 284 (suggesting that the tort concepts of proximate cause are inapplicable to criminal cases, and that a more direct cause is required for criminal liability); State v. Magruder (1988), 234 Mont. 492, 497, 765 P.2d 716, 719 (stating that this "Court is not able to envision a case under our present criminal code in which a proximate cause instruction would be appropriate").*

¶38.We therefore hold that a person, who is found to have used justifiable force, but who nevertheless fails to summon aid in dereliction of the legal duty as defined here, may be found criminally negligent only where the failure to summon aid is the cause-in-fact of death, rather than the use of force itself.

¶39.Furthermore, it is important to emphasize that even where such a duty "revives" under the foregoing analysis, the breach of this duty should not be construed as constituting criminal negligence *per se*. To the contrary, it is entirely conceivable that in circumstances where such a legal duty may rightfully be imposed, a failure to summon medical assistance--due to fear, shock, or some other manifestation resulting from the

confrontation--would not be a gross deviation from an ordinary standard of care as required by Montana's negligent homicide statute. Thus, a breach of the legal duty to summon aid may be the cause-in-fact of death, but is still not necessarily a crime under § 45-5-104, MCA. Moreover, as in ordinary negligence cases, the existence of a legal duty to act--whether at the time of injury or later by "revival"--is a question of law, while the breach of the duty is for determination by the fact finder. *See Estate of Strever v. Cline* (1996), 278 Mont. 165, 175, 924 P.2d 666, 672.

¶40.Determining if and to what extent this holding applies here, however, is further complicated by the procedural facts. Namely, the State brought a single charge of negligent homicide for the stabbing *and* the failure to summon medical aid. Thus, if the use of force is found to be justified, we conclude that Kuntz, as a matter of law, must be acquitted of this single charge regardless of her conduct subsequent to the stabbing. *See Park v. Sixth Judicial Dist. Court,* 1998 MT 164, ¶ 42, 289 Mont. 367, ¶ 42, 961 P.2d 1267, ¶ 42 (Leaphart, J. concurring) (stating that justifiable use of force, if proven, is a complete defense resulting in an acquittal). *See also In Interest of Smith* (Pa. 1990), 579 A.2d 889, 897 (reversing conviction for lesser-included offense of involuntary manslaughter where self-defense was found justified, and therefore afforded defendant a "complete defense to any criminal homicide"). This complication necessarily leads us to the next issue.

## Issue 3.

**Should the prosecution be permitted to argue that the defendant's actions following the use of deadly force may be considered by the fact-finder in making its decision as to the validity of the justifiable use of force defense?**

¶41.In denying Kuntz's motion, the District Court did not make a preliminary evidentiary ruling on this specific issue. The court did, however, state that at trial "both sides can make their argument whether Defendant's actions after the stabbing tend to refute her claim of justification." This determination, in turn, led to extensive briefing by the parties pursuant to the application for the writ of supervisory control. Subject to our *de novo* review, we are consequently inclined to review whether this determination was correct in light of the holdings reached thus far.

¶42.Pursuant to § 45-3-102, MCA, a person is "justified in the use of force or threat to use force against another when and to the extent that he reasonably believes that such conduct

is necessary to defend himself or another against such other's imminent use of unlawful force." Here, Kuntz will have the burden at trial of producing sufficient evidence on this issue to raise a reasonable doubt of her guilt. *See State v. Daniels* (1984), 210 Mont. 1, 16, 682 P.2d 173, 181.[(1)] Ultimately, whether or not her use of force was justified will be determined by the jury. *See State v. Barrack* (1994), 267 Mont. 154, 162-63, 882 P.2d 1028, 1033. Such a determination will be made based on evidence of what Kuntz reasonably believed at the time she was confronted with the alleged imminent use of unlawful force.

¶43.Consequently, the question of whether or not the stabbing resulted from an act of justified self-defense "must be determined by a consideration of the circumstances as they existed at the time the blow was struck." *People v. Fowler* (Cal. 1918), 174 P. 892, 896 (finding evidence insufficient to support claim of justified self-defense). Accordingly, we conclude that whether Kuntz had a duty to subsequently summon medical aid and whether she failed in performing this duty are wholly immaterial in determining whether the use of force was justified. Such evidence would in no sense tend to make Kuntz's reasonable belief at the time of the attack more or less probable, pursuant to Rule 401, M.R.Evid. Therefore, the District Court shall be guided by this conclusion in its evidentiary rulings regarding post-stabbing evidence offered by the State for the purpose of rebutting Kuntz's claim of justified use of force.

## Issue 4.

**Should the prosecution be permitted to argue that even if the defendant acted with justifiable use of force, her delay in seeking medical aid for the mortally wounded attacker was a factor in causing his death?**

¶44.Pursuant to the charge of negligent homicide as it currently stands, if the use of force was indeed justified, then a subsequent delay in seeking medical aid would be immaterial in addressing the factors that caused death. Again, the District Court in its evidentiary rulings should be guided by our conclusion that, as presently charged, a finding that Kuntz's use of force was justified would be a complete defense requiring acquittal, and that she had no duty to immediately render or summon aid for Becker.

¶45.More generally, this conclusion necessarily means that evidence of a person's exercise of the right to seek and secure safety cannot, in turn, be used as evidence demonstrating a failure or delay in summoning aid. A flight to safety does not necessarily require a flight

to the nearest phone by the fastest means available. Again, the revival of a duty to render aid does not commence following a justified use of force until a person has fully exercised her right to seek and secure safety. Consequently, any evidentiary ruling by the District Court should be guided by this principle regardless of how the charge or charges are made.

## Issue 5.

**May the defendant's actions following an unjustified use of deadly force be alleged as facts supporting charging the offense of negligent homicide?**

¶46.This issue specifically addresses the State's case in chief, namely that the evidence will show that Kuntz's use of force was not justified, and she negligently caused Becker's death by first stabbing him and then failing to summon medical aid. To this extent, we hold that the State may, of course, allege relevant facts that may tend to prove the elements of the charged crime, negligent homicide. The evidentiary purpose of such alleged facts, however, is strictly limited by our holdings under the above issues.

¶47.For these reasons, the District Court's order denying Kuntz's motion to amend or strike the amended information is affirmed, and this case is remanded for further proceedings consistent with this opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ J. A. TURNAGE

/S/ JIM REGNIER

/S/ KARLA M. GRAY

/S/ W. WILLIAM LEAPHART

Justice Terry N. Trieweiler concurring and dissenting.

¶48.I concur with the majority's conclusion that two people who have cohabited for a prolonged period of time may, under certain circumstances, owe each other the same duties flowing from their personal relationship as would be owed from one married person

to his or her spouse.

¶49.I also concur with the majority's conclusion that when a person justifiably uses force to defend herself against an aggressor she has no duty to assist her aggressor if to do so would create a risk of harm to her. However, I disagree with, and therefore dissent from the majority's conclusion that at some point, a victim of aggression who has justifiably defended herself has a "revived" obligation to come to the assistance of the person against whom it was necessary for her to defend herself.

¶50.The majority has concluded that although circumstances occur which are so extreme that a woman is justified in the use of deadly force to defend herself, a jury can, after the fact, in the safe confines of the jury room, conclude that at some subsequent point she was sufficiently free from danger that she should have made an effort to save her assailant and that because she didn't she is still criminally liable for his death even though at some previous point in time she was justified in taking his life. This result is simply unworkable as a practical matter and makes poor public policy.

¶51.Section 45-3-102, MCA, provides that a person is justified in the use of deadly force only when necessary to prevent imminent death or serious bodily harm to herself or another, or to prevent commission of a forceable felony. It severely limits the circumstances under which deadly force is justified. However, it specifically recognizes that under those circumstances, the amount of force necessary may be deadly. It is inherently contradictory to provide by statute that under certain circumstances deadly force may be justified, but that having so acted, a victim has a common law duty to prevent the death of her assailant.

¶52.Furthermore, I conclude that the obligation imposed by the majority opinion is confusing. It predicates criminal liability on a finding that the failure to summon aid is the cause in fact of death. However, where a person is placed in peril by another's justified use of force it can never be said that the failure to summon aid, rather than the original act of force, is the cause in fact of death, because presumably death would never have occurred but for the original act of self-defense. For example, the majority correctly notes that in this case, Bonnie Kuntz admits that she stabbed Warren Becker in the chest and that the stab wound caused his death. How then is a jury to distinguish between the original act, which may have been justified, and a failure to summon aid for the purposes of determining the cause in fact of Becker's death?

¶53.Pursuant to § 45-2-202, MCA:

A material element of every offense is a voluntary act, which includes an omission to perform a duty which the law imposes on the offender and which he is physically capable of performing . . . .

I conclude that when a person is attacked by another and reasonably believes that deadly force is necessary to prevent imminent death or serious bodily injury to herself and therefore uses deadly force to defend herself, she has no duty, "revived" or otherwise, to summon aid for her assailant. The fact that the use of force by her was justifiable as defined by statute is a complete defense to any charge based on her assailant's death. *See In the Interest of Smith* (Pa. Super. 1990), 579 A.2d 889, 896-97.

¶54.Nor, has the majority cited any authority for its conclusion that a person who causes another's death in justifiable defense of herself can be criminally liable for then failing to summon aid for her assailant. There is no authority for good reason. A person driven to the point of having to violently defend herself from a violent attack should not, at the risk of criminal punishment, be required to know that at some undefined point in time she has a duty to save that same person. A normal person under those circumstances is incapable of undertaking such an intellectual process. To require her to do so is inconsistent with the traditional notion that when criminal liability is based on the failure to perform a duty, it must be a plain duty which leaves no doubt as to its obligatory force. *State v. Benton* (Del. 1936), 187 A. 609, 616.

¶55.For these reasons I dissent from the majority's conclusion that a person justified in the use of deadly force in self-defense, ever has an obligation to come to the aid of her assailant.

¶56.Other than as specified in the preceding paragraphs, I concur with the majority opinion.

/S/ TERRY N. TRIEWEILER

Justice William E. Hunt, Sr., joins in the foregoing concurring and dissenting opinion of Justice Terry N. Trieweiler.

/S/ WILLIAM E. HUNT, SR.

1. Although not expressly holding so, *Daniels* overturned a line of case law, notably *State v. Graves* (1981), 191 Mont. 81, 622 P.2d 203, and *State v. Azure* (1979), 181 Mont. 47, 591 P.2d 1125, that had previously held that jury instructions stating that the State had the burden to prove an absence of justification beyond a reasonable doubt were proper. *See also State v. Gratzer* (1984), 209 Mont. 308, 318, 682 P.2d 141, 146 (holding that the State is "not required to prove the nonexistence of every fact which it is willing to recognize as an exculpatory or mitigating circumstance affecting the degree of culpability or the severity of the punishment").