DA 10-0437

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2011 MT 251

STATE OF MONTANA,

        Plaintiff and Appellee,

  v.

ALICIA JO HOCTER,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. DC 09-090
Honorable Dirk M. Sandefur, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Joslyn Hunt, Chief Appellate Defender; Garrett R. Norcott,
Assistant Appellate Defender, Helena, Montana

      For Appellee:

            Steve Bullock, Montana Attorney General; Micheal S. Wellenstein,
Assistant Attorney General, Helena, Montana

            John Parker, Cascade County Attorney, Great Falls, Montana

Submitted on Briefs:  August 3, 2011

Decided:   October 11, 2011

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Alicia Hocter appeals from her conviction in the District Court, Eighth Judicial District, Cascade County. We affirm.

ISSUE

¶2 Hocter raises two issues on appeal:

¶3 1. Did the District Court err when it denied Hocter's motion to dismiss the charge of criminal endangerment?

¶4 2. Whether the District Court erred in instructing the jury on criminal endangerment predicated on a defendant's omission or failure to act.

BACKGROUND

¶5 On March 4, 2009, the State filed an information charging Hocter with attempted deliberate homicide, §§ 45-5-102 and 45-4-103, MCA (2007), and, in the alternative, attempted mitigated deliberate homicide, §§ 45-5-103 and 45-4-103, MCA (2007). On February 18, 2009, at approximately 3:00 p.m., Hocter was at her apartment that she shared with her boyfriend. Her boyfriend was out at the time, and she was caring for both her one-month-old child, and her boyfriend's six-month-old daughter S.B.

¶6 The affidavit that accompanied the charging information alleged that S.B. was crying and Hocter could not comfort her. Hocter picked S.B. up and dug her fingers into S.B.'s abdomen. As S.B. was wriggling, Hocter tripped and lost her temper. She swung S.B. head-first into the top bar of her crib at least twice. The first strike caused S.B.'s head to recoil and potentially double-strike. The second strike resulted in a sudden stop

2

of S.B.'s head into the rail. Hocter then tossed S.B. into the crib, turned music up, and left the room. Hocter subsequently realized that S.B. needed help. She claimed that she could not find her phone to call 911. Additionally, she asserted that despite S.B.'s distress, she did not seek help from her neighbors because she did not want to leave her one-month-old infant. S.B. is now permanently blind with long-term handicaps in vision, motor functioning and cognitive functioning.

¶7 In early November, Hocter and the State entered into a plea agreement. The State agreed to drop both attempted homicide charges and Hocter agreed to plead guilty to new charges of aggravated assault, § 45-5-202, MCA (2007), and criminal endangerment, § 45-5-207, MCA (2007). The agreement stated that if the District Court refused to adopt the agreement, Hocter could withdraw her guilty plea. The State filed an amended information reflecting the new charges.

¶8 On November 16, 2009, Hocter appeared at a change of plea hearing. She engaged in the following colloquy with the District Court:

| [Court]: | Alright. So, the State then alleges, under the Amended information that's filed here today, that you committed the offense of Aggravated Assault, a Felony, and Criminal Endangerment, a Felony, on or about February 18th, 2009, in Cascade County, Montana. What is it that you did that constitutes those offenses? |
| [Hocter]: | I struck a child, [S.B.], on a crib with more force than I had known, causing serious injury, bodily injury. |
| [Court]: | All right. And whose child was it? |
| [Hocter]: | It was my boyfriend's, at the time. |
| | . . . |
| [Court]: | Okay. And how did you come to have contact with the child? Were you taking care of the child? |
| [Hocter]: | Yes. |
| | . . . |

3

[Court]: Okay. So, what happened? How did this all happen?

[Hocter]: I had been under a lot of stress and the best way to explain it, is that I had been mourning that day because it was the anniversary of my mother's passing and [S.B.] had been colicky and I had only recently given birth.

. . .

[Court]: Okay.

[Hocter]: And the stress had gotten to me.

[Court]: All right. So, what happened? Was [S.B.] crying because she was colicky?

[Hocter]: Yes.

[Court]: Okay. And what - -

[Hocter]: I went to take her to her crib and to put her down to see if she would take a nap and I don't remember right after that, but I had come back and she had been very seriously injured. And I tried to find a phone, could not find one.

[Court]: Well, now, back up. Now, I know you said you hit her, but I want you to take me through exactly what happened.

. . .

[Hocter]: That I had took her into the room and I was very frustrated. I had held her by the waist and chest area and struck her on to the crib. And then, roughly put her into her crib and walked out, shutting the door.

[Court]: Okay. When you say you had struck her, you're holding by the waist and you struck her on the crib, how did you do that? Did you swing her and hit her head on the crib or what?

[Hocter]: I don't know how best to describe it. It was as if -- well, I had her by the waist in the ribcage area and it's not that I had swung her over my shoulder or anything, it was more from my body to the crib. And then, that was it.

[Court]: And when you say you struck her on the crib, then did her head hit the crib?

[Hocter]: Yes.

. . .

[Court]: How many times did you do that?

[Hocter]: A couple times, like twice.

[Court]: All right. Did you see that the baby was hurt or injured at that time?

[Hocter]: At the time, I did not.

[Court]: What did you do, then, after you hit her on the crib twice?

[Hocter]: I roughly put her in the crib.

. . .

4

| [Court]: | I understand that you say you didn't remember this until later, but in looking back at it -- |
|---|---|
| [Hocter]: | Yes. |
| [Court]: | -- did you -- |
| [Hocter]: | I know that she was injured very badly |

.   .   .

| [Court]: | Did you get any help? |
|---|---|
| [Hocter]: | As much as I could. |

.   .   .

| [Court]: | And then, did you call an ambulance? |
|---|---|
| [Hocter]: | I couldn't find a phone. |
| [Court]: | So then what happened? |
| [Hocter]: | I had to wait until my boyfriend came home and he had looked around for a phone; it had taken him 10 to 15 minutes to look for a phone, also. And he finally found one and called an ambulance. |
| [Court]: | So, how long was it from the time that you went back in there and realized the kind of shape that she was in, until you were able to get an ambulance called through your boyfriend? |
| [Hocter]: | I'm not positive; it was an hour, hour and a half. |

.   .   .

| [Court]: | All right. And why didn't you just take the child to the hospital? |
|---|---|
| [Hocter]: | Because I don't have a license and I don't have a vehicle. |

The District Court accepted Hocter's guilty pleas, ordered a presentence investigation report and scheduled a sentencing hearing.

¶9 On February 25, 2010, Hocter appeared at sentencing. The District Court informed her that it refused to accept the plea agreement. Hocter was given the opportunity to withdraw her guilty pleas, which she did. Trial was set for June 14, 2010.

¶10 On June 15, 2010, after a jury was sworn in, Hocter moved to dismiss the criminal endangerment charge. She argued that the Third Amended Information and original affidavit did not provide adequate notice of the State's theory regarding the criminal endangerment charge. Hocter asserted that the charging documents failed to specify

whether criminal endangerment was predicated on Hocter's affirmative conduct, or her failure to provide medical assistance to S.B. The District Court denied Hocter's motion, concluding that the State had "stated sufficient facts in the affidavit to support either of those theories." The State ultimately opted to pursue a criminal endangerment charge based on Hocter's failure to aid S.B.

¶11 On June 16, 2010, the third day of trial, Hocter renewed her motion to dismiss the criminal endangerment charge. She argued that the State could not charge criminal endangerment under an omission or failure to act theory without articulating what legal duty she had failed to perform. The District Court rejected this argument, concluding that the criminal endangerment statute contains a duty to "not purposely or knowingly subject third parties to a substantial risk of death or serious bodily injury by conduct."

¶12 After the close of evidence, the parties held a conference to settle jury instructions. Hocter objected to the District Court-drafted criminal endangerment instruction, arguing that it created a duty "that the law does not allow." The District Court rejected Hocter's contentions but noted they were preserved for appeal. With regard to criminal endangerment, the District Court instructed the jury as follows:

> A person commits the offense of criminal endangerment if the person knowingly engages in conduct that creates a substantial risk of death or serious bodily injury to another.
>                            .   .   .
> *In this case, the State alleges that the Defendant committed the offense of criminal endangerment by failing or omitting to act to aid [S.B.]. Accordingly, to convict Defendant of the offense of criminal endangerment, the State must prove that Defendant:*
> 1. *Knowingly failed or omitted to act to aid [S.B.][;]*
> 2. *with the knowledge that her failure or omission to act created substantial risk of death or serious bodily injury to [S.B.][.]*

6

If you find from your consideration of the evidence that the State has proved beyond a reasonable doubt that the Defendant knowingly engaged in conduct that created substantial risk of death or serious bodily injury to [S.B.], then you should find Defendant "guilty." On the other hand, if you find from your consideration of the evidence that the State has not proved beyond a reasonable doubt that Defendant knowingly engaged in conduct that created a substantial risk of death or serious bodily injury to [S.B.] you should find Defendant "not guilty."

(Emphasis added.) The jury found Hocter guilty of both aggravated assault and criminal endangerment. She filed a timely appeal to this Court.

## STANDARDS OF REVIEW

¶13 This Court reviews the denial of a motion to dismiss in a criminal case de novo. *State v. Hardaway*, 2001 MT 252, ¶ 64, 307 Mont. 139, 36 P.3d 900.

¶14 "In considering whether a district court has correctly instructed the jury in a criminal case, we determine whether the instructions, taken as a whole, fully and fairly instructed the jury on the law applicable to the case." *State v. Cybulski*, 2009 MT 70, ¶ 34, 349 Mont. 429, 204 P.3d 7. Recognizing that a district court has broad discretion when instructing a jury, we review jury instructions for an abuse of discretion. *State v. Swann*, 2007 MT 126, ¶ 32, 337 Mont. 326, 160 P.3d 511. The instructions must prejudicially affect the defendant's substantial rights to constitute reversible error. *State v. Christiansen*, 2010 MT 197, ¶ 7, 357 Mont. 379, 239 P.3d 949.

## DISCUSSION

¶15 *Did the District Court err when it denied Hocter's motion to dismiss the charge of criminal endangerment?*

¶16 Charging documents must "reasonably appraise the accused of the charges" so that she has the opportunity to prepare and present a defense. *State v. Wilson*, 2007 MT 327, ¶ 25, 340 Mont. 191, 172 P.3d 1264. To determine whether charging documents are sufficient, this Court reads both the information and supporting affidavit together. *Wilson*, ¶ 25. The standard for sufficiency is "whether a person of common understanding would know what was charged." *Hardaway*, ¶ 67. Hocter argues that the District Court should have dismissed the charge of criminal endangerment because the charging documents were insufficient to give her notice that the criminal endangerment charge was based on her failure to seek aid for S.B. Hocter asserts she had no knowledge of what she was charged with until the first day of trial.

¶17 We conclude Hocter had actual notice of the State's theories of criminal endangerment in 2009, over six months before she first objected to the sufficiency of the charging information. Both the criminal endangerment and aggravated assault counts were added to the charging information based on an agreement between the prosecution and Hocter. When Hocter sought to plead guilty in November 2009, she engaged in a colloquy with the District Court and explained how her conduct, or lack thereof, constituted criminal endangerment.

¶18 Hocter articulated facts that supported two theories of criminal endangerment, one premised on her failure to provide medical care to S.B., and one premised on her affirmative conduct towards S.B. Hocter admitted the following facts: (1) Hocter had undertaken to care for S.B., (2) after striking S.B. against the crib, Hocter placed S.B. in the crib "roughly," (3) Hocter left S.B. alone in the crib, (4) Hocter became aware that

8

S.B. was injured very badly, and (5) Hocter did not seek any medical attention for S.B. Thus, in November 2009, over six months before she first claimed that the charging information was insufficient, Hocter possessed actual knowledge of the facts that the State was obligated to prove to support the two theories of criminal endangerment. The District Court did not err when it denied Hocter's motion to dismiss the charge of criminal endangerment.

¶19 *Whether the District Court erred in instructing the jury on criminal endangerment predicated on a defendant's omission or failure to act.*

¶20 At the outset, the State argues that the Court should decline to consider this issue because Hocter failed to offer a jury instruction. This Court declines to "predicate error upon the failure to give an instruction when the party alleging the error failed to offer the instruction." *State v. Swan*, 279 Mont. 483, 486, 928 P.2d 933, 935 (1996). Hocter objected to the criminal endangerment jury instruction because she believed she had no duty to render aid to S.B., and thus the criminal endangerment charge should not have been submitted to the jury. In such circumstances she cannot be faulted for not submitting an instruction. Hocter preserved this issue for appeal.

¶21 Hocter argues that the District Court failed to fully and fairly instruct the jury with regard to the charge of criminal endangerment based on her failure to aid S.B. Hocter asserts that the District Court's instructions did not identify a legally imposed duty that required her to render medical assistance to S.B. The criminal endangerment statute provides, in pertinent part, "[a] person who knowingly engages in conduct that creates a substantial risk of death or serious bodily injury to another commits the offense of

criminal endangerment." Section 45-5-207, MCA. In order to convict a defendant of criminal endangerment, the State must prove two elements: (1) the defendant engaged in conduct that created a substantial risk of death or serious bodily injury to another person, and (2) the defendant acted knowingly with regard to that conduct. *See Cybulski*, ¶¶ 35-37.

¶22 "Conduct" is defined as, "an act or series of acts and the accompanying mental state." Section 45-2-101(15), MCA. An "act" has its "usual and ordinary meaning and includes any bodily movement, any form of communication, and when relevant, a failure or omission to take action." Section 45-2-101(1), MCA. A material element of every criminal offense is a "voluntary act." Section 45-2-202, MCA. A "voluntary act" includes an omission or failure "to perform a duty that the law imposes on the offender and that the offender is physically capable of performing. . . ." Section 45-5-202, MCA. Thus, failure or omission to take action pursuant to a duty imposed by law can constitute "conduct" for the purposes of criminal endangerment. The question here is whether Hocter's failure to take action to aid S.B., under these circumstances, constituted criminal endangerment.

¶23 This Court has recognized that not every failure to take action subjects a person to criminal liability. "For criminal liability to be based upon a failure to act, there must be a duty imposed by the law to act, and the person must be physically capable of performing the act." *State ex rel. Kuntz v. Montana Thirteenth Judicial Dist. Court*, 2000 MT 22, ¶ 14, 298 Mont. 146, 995 P.2d 951. In the absence of "a duty that the law imposes," a person cannot be criminally liable for failure to "rescue or summon aid for another person

10

who is at risk or in danger, even though society recognizes that a moral obligation might exist." *Kuntz*, ¶ 14. This Court has recited at least six common law exceptions that apply to the general rule: (1) a duty based on a personal relationship, such as parent-child or husband-wife; (2) a duty based on statute; (3) a duty based on contract; (4) a duty based upon voluntary assumption of care; (5) a duty to control the conduct of others; and (6) a duty based on being a landowner. *Kuntz*, ¶ 15. Whether a legal duty to act exists is a question of law for the court. *Kuntz*, ¶ 39. Whether a defendant failed to act pursuant to that duty is a question for the finder of fact. *Kuntz*, ¶ 39.

¶24 A parent's criminal liability based upon a failure to act in accordance with common law affirmative duties to protect their children is recognized in numerous jurisdictions, including this one. *State v. Powers*, 198 Mont. 289, 298-299, 645 P.2d 1357, 1362-1363 (1982) (mother convicted of deliberate homicide for causing child's death by her failure to perform duties as a parent); *State v. Hoffman*, 196 Mont. 268, 271-272, 639 P.2d 507, 509 (1982) (mother's failure to obtain medical aid for child was sufficient degree of negligence as to constitute negligent homicide); *see also People v. Stanciel*, 606 N.E.2d 1201 (Ill. 1992) (mother guilty of homicide by sanctioning ongoing abuse of child by boyfriend); *State v. Williquette*, 385 N.W.2d 145 (Wis. 1986) (mother guilty of child abuse by sanctioning continuous physical and sexual abuse of children by husband); *State v. Walden*, 293 S.E.2d 780 (N.C. 1982) (mother guilty of assault for failure to prevent abuse); *Smith v. State*, 408 N.E.2d 614 (Ind. App. 1980) (mother held criminally responsible for failing to prevent fatal beating of child by her boyfriend).

11

¶25 Numerous jurisdictions have recognized that in addition to biological and adoptive parents and legal guardians, there may be other adults who establish familial relationships with and assume responsibility for the care of a child, thereby creating a legal duty to protect that child from harm. *See e.g. State v. Miranda*, 715 A.2d 680 (Conn. 1998) (boyfriend who considered himself victim's stepfather had assumed duty of care for the child); *People v. Wong*, 182 A.D.2d 98 (N.Y. App. Div. 1992), *rev'd on other grounds*, 619 N.E.2d 377 (N.Y. 1993) (babysitters' failure to provide medical care after harming child sufficient grounds for charge of manslaughter); *State v. Orosco*, 833 P.2d 1155 (N.M. 1991) (defendant, who lived with and assumed care of victim, stood in position of parent and could be held criminally liable for another's abuse); *People v. Salley*, 153 A.D.2d 704 (N.Y. App. Div. 1989) (because defendant had assumed parental obligations and disregarded unjustifiable risk to child, she could be properly convicted of manslaughter). We have recognized a "mutual reliance" duty owed to "two people, though not closely related, [who] live together under one roof." *Kuntz*, ¶ 19.

¶26 In *Kuntz*, this Court found the idea that persons in a relationship involving cohabitation would not have a legal duty to summon medical aid for one another "untenable." *See Kuntz*, ¶ 19. Not extending this duty to the children present in such relationships would constitute an absurd distinction, particularly given that children are dependent upon others for care and intervention when sick or injured. Census information shows that children under the age of five years frequently live in the households of cohabiting adults. Rose M. Kreider & Diana B. Elliott, *America's Families and Living Arrangements: 2007*, Current Population Reports, P20-561, 17, U.S.

12

Census Bureau, Washington, DC (2009). "To distinguish among children in deciding which ones are entitled to protection based upon whether their adult caregivers have chosen to have their relationships officially recognized hardly advances the public policy of protecting children from abuse." *Miranda*, 715 A.2d at 690.

¶27 In this case, Hocter stated that she had been involved in S.B.'s life since her birth, and that she loved S.B. no differently than her own one-month-old daughter who was also in her care. We conclude that Hocter had established a personal relationship akin to that of a parent with S.B., and that she had voluntarily assumed responsibility for the welfare of S.B. As such, there existed a common law duty of protect S.B. from harm, and the breach of this duty was the appropriate basis for a conviction pursuant to § 45-5-207, MCA (2007).

¶28 While district courts must instruct the jury on each theory which is supported by the record, defendants are not entitled to have the jury instructed on every nuance of their theory of the case. *Cybulski*, ¶ 36. Further, courts are not at liberty to introduce additional elements to a statute. Section 1-2-101, MCA (courts may not insert what has been omitted from statutes or omit what has been inserted). The District Court's instruction to the jury was based upon the pattern instruction for criminal endangerment and included the relevant mental state requirements. The District Court properly determined that Hocter owed S.B. a duty to summon medical aid, as questions of law are not properly considered by the trier of fact. The instructions given by the District Court properly required the jury to determine whether Hocter breached that duty.

¶29    Based on the foregoing, we conclude that the District Court did not err when it denied Hocter's motion to dismiss the charge of criminal endangerment, and fully and fairly instructed the jury on the offense of criminal endangerment for failure or omission to act to aid.  Affirmed.

/S/ MIKE McGRATH

We concur:

/S/ BRIAN MORRIS
/S/ JIM RICE
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON